In re Receivership LORD & POLK CHEMICAL Co.

New Castle March Term, 1895.

Act relating to insolvent corporations; Receivers under; Payment of debts under, not according to rank or grade — taxes; No lien on personal property without distress — when equity recognizes diligence in creditors.

1. Equity looks not so much at the form of a debt as to the good faith in which it was made or created. The law recognizes diligence in creditors and gives them a preference according to the rank or grade of their debt; equity, however, imputes no particular merit to diligence unless the advantage thereby acquired amounts to a lien, or some vested right or interest which neither equity nor law will allow to be disturbed.

2. There is no common-law rule which makes the levy and apportionment of the taxes *ex proprio vigore* liens on the property of the taxable. Such liens can only be created by statute. There is no statute in this State declaring real estate taxes to be liens on personal property, without the intervention of some kind of execution process. The only mode, therefore, of reducing them to such liens is by distress.

3. The transfer of a fund from a legal to an equitable jurisdiction will not exempt it from the law of its original jurisdiction.

4. Whenever a statute undertakes to provide for a specific matter or thing already covered by a common-law rule, omissions in its provisions of certain portions of the rule may be taken as indicative of a legislative intent to repeal or abrogate the same. And this, though in all other respects the statute and common law are in exact conformity.

5. Under the act relating to insolvent corporations which does not provide for the order in which the debts shall be paid, judgment debts have no precedence over simple contract debts.

6. A receiver appointed under the act relating to insolvent corporations, paid off the real estate taxes out of a fund in his hands arising from the sale of the personal property. A real estate mortgage, being the first lien, was then foreclosed. Held, that an amount equivalent to that paid in taxes should be deducted from the fund applicable to the mortgage, and added to that applicable to a subsequent judgment creditor.

PETITION for the ascertainment of the priority of certain liens.— This case came up on the petition of certain creditors of the Lord & Polk Chemical Company praying for the ascertainment of the priority of certain liens against said Lord & Polk Chemical Company. The facts are sufficiently stated in the opinion of the Chancellor.

J. Biggs, for I. P. Thomas & Son Company.

The judgment creditors of the Lord & Polk Chemical Company can have no preference in this court over simple contract creditors.

All debts in a court of equity stand on an equal footing and should be paid ratably without regard to their form or grade. Rev. Code of Del. (1893), chap. 132, p. 960, § 4; Horsey et al. v. Stockley et al., 4 Del. Ch. 536; Comly v. Waters et al., 2 id. 72; Newells v. Morgan et al., 2 Harr. 225; 1 Story's Eq. Jur., §§ 547, 548, 549, 551, 552; 2 id., §§ 829, 831, 841; Adams' Eq.

252; 5 Am. & Eng. Ency. of Law, 204, 205; Skip v. Harwood, 3 Atk. 564; Lowne v. American Fire Ins. Co., 6 Paige, 482; Guardian Savings Institution v. Bowling Green Savings Bank, 65 Barb. 275; Stockholders of Cochetute Bank v. Colt, 1·Gray, 382; Atlas Bank v. Nahant Bank, 23 Pick. 488; Commonwealth v. Phoenix Bank, 11·Metc. 147.

We claim the item of taxes should be paid out of the real or personal estate, and no portion of it should be taken from the funds arising from the bills receivable, because the bills receivable were in no way liable for the taxes.

Should the Chancellor be of the opinion that the fund now in court should be distributed among the judgment creditors alone, we claim that I. P. Thomas & Son Company should receive their *pro rata* share, because they are judgment creditors, and had their standing in court before the receiver was appointed.

L. C. Vandegrift, for Fruit Growers' National Bank, and W. M. Byrne, for Ann E. Lord.

We contend that the funds now in the registry of this court are legal, as distinguishable from equitable assets.

The difference is well defined by the following authorities: 1 Story's Eq., §§ 551, 552; Adams' Eq. 252.

Some of the funds being produced by the sale of the personal property coming into the hands of the receiver subject to levy, it is conceded that the levy must be paid out of such funds before they are applicable to any other debts in this case or to the judgment of Ann E.

Lord. Gluck & Becker, 21; Wiswall v. Sampson, 14 How. 64, conceded by both sides in argument.

If, as we contend, they are legal assets, then in their distribution this court should follow such a distribution as would be made at law. 1 Story's Eq., §§ 551, 552.

The other side, however, contend that there is no provision in the statute for the distribution of the assets of an insolvent corporation when assets are not sufficient to pay all the creditors.

That is true and we are now here to see whether this court, having no statute to guide it, will distribute the funds *pro rata* among all the creditors without regard to their grade; or whether it will recognize those creditors as entitled to priority of payment who have been diligent in reducing their claims to judgments and issuing executions thereon.

Certainly, this receiver had no right to make any preference among creditors. He is merely an officer of the court and his actions are not only presumed to be with the court's approval, but they are subject to review by the court. If he should take it upon himself to distribute this fund and the court upon the application of any creditor should decide he had done it improperly, it would compel him to account to the creditor aggrieved.

It lies entirely within the province of this court to determine how the distribution of the assets of an insolvent corporation in the hands of a receiver shall be made. Edwards' Receivers in Chancery, 104; Gluck & Becker's Receivers of Corporations, 133, 134, 117; High on Receivers, §§ 134, 4.

The duty to distribute these funds, being thus upon the court, and they being insufficient to pay all creditors in full, the question is, how shall distribution be made?

There is nothing in the statutes to guide the court in the mode of distribution, and there is no practice upon the subject, the question arising now for the first time under this bald act.

When a condition like this confronts the courts of this State they turn to the common law for guidance.

The rule there is that where legal assets (as these are) are to be distributed among creditors and are insufficient to pay all, debts shall have priority of payment according to their respective grades.

The common law recognized a difference in grade between judgment creditors and simple contract creditors. The former were of a higher grade and entitled to priority of payment out of the funds before anything was applicable to the simple contract creditors.

We occupy here the position of judgment creditors and claim that these funds, under the common-law rules, are applicable *pari passu* to our judgments before any part is applicable to the simple contract creditors. Wentworth on Executors, 265, 266 *et seq.*, and notes, 276 *et seq.;* 1 Comyn's Dig. 348, chap. 2; 2 Bacon's Abridg. 433 *et seq.;* Buckland v. Brooks, 1 Cro. Eliz. 315; Littleton v. Hebbins, id. 793; Sawyer v. Mercer, 1 T. R. 691; 2 Williams on Executors, 995 *et seq.*, 102 *et seq.*

Because the policy of the law in this State supports our contention that legal assets will be distributed according to the grade or solemnity of the debt and because

in the only analogous case which has arisen, viz., that of decedents' estates, the statutes of this State recognize differences in grade.

If Victor Lord had been trading as an individual and Mr. Hoffecker had been his administrator, instead of trading under the name of a corporation with Mr. Hoffecker now winding up his affairs as receiver, there is no doubt that recognition would be given to the different grades of indebtedness and the mode of distribution contended for by us followed.

In stating that this court should follow the common law as to the distribution of these assets, we have depended not upon any statute, decisions or practice of this State, because there seems to be none, but have depended upon what is conceived to be the well-established common-law rule as laid down by the authorities above referred to. That these authorities reach sufficiently far back to be considered common-law principles, we would call the court's attention to Clawson v. Primrose, 4 Del. Ch. 643.

The question may be asked whether at the time of the decisions cited from Croke Elizabeth there was any Statutes of Distribution, or whether those decisions were made upon what the courts of that day deemed should be the common law, without recourse to statutes.

This would seem to us to be an immaterial inquiry, because in either event those old decisions show what the law of England then was, whether made by men sitting in Parliament or upon the Bench. They show what the controlling spirit of the law then was, whether emanating from Englishmen who sat in one place or the other.

A creditor having obtained an advantage at law by obtaining a judgment will not be deprived of that advantage even in a court of equity.   Story's Eq., § 553; Waring v. Danvers, 1 P. Wms. 297; Newell v. Morgan, 2 Harr. 225.

The policy of this State where the courts are called upon to distribute a fund is to recognize the diligence of creditors as exemplified in the obtaining of judgments.

What is the difference between diligence as against a natural person who has died and an artificial person defunct?

Under our view of the law, the judgment obtained by I. P. Thomas & Son Company does not change its status.   That company is still a simple contract creditor, and, therefore, entitled to no part of the fund in court until the judgment creditors are paid in full.   Because suit was not commenced until April 22, 1893; and the application for a receiver of this insolvent corporation was made April 19, 1893, on which day a preliminary injunction was issued and all the property and effects of this corporation were from the last-mentioned date *in custodia legis*, the receiver was  appointed by the court on April 22, 1893, "with authority to wind up its affairs and do all other things necessary in the premises under the order and direction of this court." Although the above suit was commenced on April 22, 1893, no judgment was obtained until December 20, 1893.

The judgment in this case, not having been obtained until long after the appointment of a receiver, although the suit was commenced possibly before the appointment of a receiver, yet this will not alter the status of

a claim nor make the creditor a judgment creditor as counter-distinguished from a simple contract creditor. High on Receivers, § 423; Gluck & Becker on Corporations, 23; High on Receivers, §§ 495, 552; Wiswall v. Sampson, 14 How. (U. S.) 52; Walling v. Miller, 108 N. Y. 173.

To show that the above judgment could not possibly be a lien and that it could only take effect from the moment of its rendition, see Rev. Code (1893), § 3, p. 809; Citizens' Loan Association v. Martin, 1 Del. Term, 146.

Our argument thus far has been based on the theory that these funds are legal assets.

Now, suppose the court should consider them equitable assets, then even in that view we are entitled to priority.

Because of our diligence in exhausting our remedies at law and now filing our petitions in this court, we thereby obtain a priority of lien, even in a court of equity. Newell v. Morgan, 2 Harr. 225.

Wolcott, Chancellor.— On the 23d day of April, A. D. 1893, John H. Hoffecker, on the application of the Fruit Growers' National Bank of Smyrna, was appointed receiver of the Lord & Polk Chemical Company, a corporation existing under the laws of the State of Delaware, said company at that time being insolvent. Its assets consisted of certain real estate, goods and chattels, and bills receivable or outstanding accounts.

Prior to the appointment of the receiver, certain of the creditors of the debtor corporation obtained liens against it in the following order: A mortgage in favor of the petitioning creditors, embracing all its real estate

for the real debt of $10,530, with interest from October 10, 1889; a judgment in favor of the New Castle County National Bank of Odessa, for the real debt of $6,676.78, upon which there was due $877.22; another in favor of Ann E. Lord for the real debt of $3,800, with interest from July 15, 1890; and another in favor of the Fruit Growers' National Bank of Smyrna, assignee, obtained by confession on a judgment bond to which said mortgage is collateral.   On these several judgments, executions were issued in the order stated, and levies made on the personal property of the debtor corporation.

There were also tax liens against the corporation which were prior in effect to the liens of the mortgage, and the tax collector shortly after the appointment of the receiver threatened to enforce the payment thereof by legal process if not promptly paid.   The receiver paid them out of the funds in his hands derived from the sale of the personal property, upon which the liens of the executions rested.

Subsequently the Fruit Growers' National Bank, after first having obtained the permission of the court, instituted foreclosure proceedings on its mortgage in the Superior Court in and for New Castle County, which resulted in the sale of the mortgaged premises, and the application of the whole of the proceeds thereof to the mortgage debt.

There is another judgment in favor of I. P. Thomas & Son Company, but it was not obtained until after the appointment of the receiver, and, therefore, does not take rank among the judgment or mortgage liens.

The goods of the debtor corporation consisted largely of phosphate material.   The receiver deeming it ex-

pedient to work this raw material up into a commercial fertilizer, and dispose of it in the most ready market at hand, obtained permission of the court so to do and realized out of it and other articles of personal property, the gross sum of $5,082.33.    Out of the remainder of the personal assets, consisting entirely of the outstanding accounts, he collected $5,792.76.

These two sums, aggregating $10,875.09, constituted the total assets of the insolvent corporation.    On the 6th day of August, A. D. 1894, the receiver passed a first and final account, which showed a net balance in his hands, after deducting all incidental costs, charges and expenses, of $7,633.01, which he paid into the registry of this court, to be disbursed under the order and direction of the Chancellor.    An order was then procured, publication whereof was duly made, requiring all the creditors to prove their claims in court on the 1st day of May, A. D. 1894, so that each one should have the opportunity to be heard as to the manner of distributing the said fund.    At the same time, upon the petition of the New Castle County National Bank of Odessa, it having had the first levy on the personal property, an order was granted directing the payment of $877.22, to it, the amount due on its execution, which left a balance in the registry of $6,756.79.

The petition on which the receiver obtained leave to pay into court the net balance in his hands, sets forth that the amount of costs and expenses, including taxes, was $3,242.09, which, being duly apportioned between the two classes of assets and deducted therefrom, would have left $1,893.18 as the amount applicable to the execution of Ann E. Lord, out of the fund which rep-

17

resents the personal property upon which she had the second levy. Barring the taxes paid by the receiver, no objection has been raised as to the amount thus applicable to her execution.

Petitions were filed by the several creditors praying the apportionment of the fund remaining in court according to the very right and equity of the matter.

The first question presented by the facts in this case is: What was the effect of the payment of the real estate taxes out of the money produced by the sale of the personal property, upon which the execution creditors held liens?

These taxes, whether prior or subsequent to the mortgage and judgments, were by statute made paramount liens on the real estate of the debtor corporation from the 1st day of March of each year in which they were respectively levied, for the period of two years thereafter. They were liens at the time of their payment by the receiver.

Not so, however, as to its personalty. There is no common-law rule which makes the levy and apportionment of the taxes *ex proprio vigore* liens on the property of the taxable. Such liens can only be created by statute. There is no statute in this State declaring real estate taxes to be liens on personal property, without the intervention of some kind of execution process.

The only mode, therefore, of reducing them to such liens is by distress. Now the tax collector never having made a legal seizure, either in fact or law, the taxes in question consequently never were liens on the personal property of this corporation. The fact that personal property is made primarily liable for payment of taxes

does not change or alter the principle.    The mere regulation of the order in which several kinds of property shall be taken in payment of the tax demand, possesses no significance whatever in the matter of determining whether they are liens or not.

To admit the primary liability of the personal property for the payment of taxes to be equivalent to the force of liens, would give to every judgment a similar effect, as the plaintiff therein must exhaust the personal property of the defendant before recourse can be had to the real estate to compel the payment of the same. While it is true that a tax is a preferred debt or obligation due from the citizen to the government, yet if the government desires to secure such a preference against individual lien creditors, it must clothe its dues with the force and dignity of a lien or take its chances in the race of diligence.

From what has been said it is manifest that at the time of the appointment of the receiver that the mortgage creditors had a first lien on the real estate subject to the liens of the taxes to the exclusion of all other creditors, and that the execution creditors had liens on the personal property with an equal degree of exclusiveness.    These were the conditions that confronted the receiver when he entered upon the duties of his office, yet he appropriated a part of the fund which was held *in custodia legis* for the benefit of the execution creditors to discharge a prior tax incumbrance on the real estate, thus diminishing the value of the security held by them, and correspondingly increasing the value of the special pledge or security held by the mortgagee.    If this is permitted to stand or remain unchallenged, then

so far as the relative positions of these two classes of creditors are concerned, a result will be reached in this court different from that which would have been attained if the legal course of administration had not been interrupted by these proceedings.

Suppose the execution creditors, with the mortgage creditors, had been allowed to pursue their legal remedy to the finish, what would have been the results? The taxes, whose liens had not expired, would have been paid first out of the proceeds of the sale of the realty and the remainder applied to the mortgage debt, and the whole of the proceeds of the sale of the personalty, would have been applied to the execution debts in the order of their priority. Though the collector might have seized the personal property and sold it, yet he would have been bound, if he had done so, to have applied the entire proceeds, less costs, to such executions as were prior to the date of his seizure, and then follow his remedy against the land.

Now the purpose of the act, under which these proceedings were instituted, was not to disturb existing legal rights and priorities — not to shave off of some claims and add to others in order to adjust the complicated affairs of insolvent corporations to ideal standards of right and wrong, but to wind up the business of such concerns in conformity with the rules of equity, one of which is to follow the law where it directs, or where it has determined the relations of rival or contesting creditors.

The receiver, however, alleges as a reason for having paid the real estate taxes out of the personal fund in hand that it was to avoid the seizure and sale of the per-

sonal property for the taxes, and the confusion and embarrassment to himself and the estate that would probably have followed such a proceeding.

It will not be disputed that he acted in good faith and did what he thought was best. Perhaps it was the wisest course under the circumstances that he could have pursued. But can such considerations as these be interposed to prevent this court from preserving the equities springing out of such conditions by placing the parties concerned in the same positions relatively, with regard to the fund in court, that they occupied with regard to the personal property prior to the appointment of the receiver? Certainly not. I shall, therefore, order the sum agreed upon as applicable to the execution of Ann E. Lord to be increased to the extent it was diminished by the payment of the taxes in question out of any share of the remaining fund that may be apportioned to the Fruit Growers' National Bank of Smyrna, it being the benefited mortgage creditor.

The next question arising out of the facts stated is: How shall the remainder of the fund be distributed?

On the part of the judgment creditors it is contended that their debts, on account of their superior grade, should have precedence over the claims of the simple contract creditors; and on the part of the simple contract creditors, it is contended that all debts in a court of equity stand on an equal footing and should be paid ratably without regard to their form or grade.

It is not disputed that the latter contention is the equitable mode of distributing the assets of an insolvent person or corporation.

But the solicitors for the judgment creditors insist that this fund is a legal asset, whose application is di-

rected by law from which it cannot be divorced by its removal from a legal to an equitable jurisdiction. There can be no question that this fund is a legal asset, and if it be true that the law does recognize such a preference, there is an end of all controversy, so far as the simple contract creditors are concerned, for it is certain that the mere fact of its transfer from the one jurisdiction to the other will not exempt it from the operation of the law of its original jurisdiction. The rule governing its apportionment, or distribution, at law would still cling to it as effectually as if it were being administered in a legal tribunal.

But is there such a law? If not, then there is nothing to hinder or restrain the operation of the principle that " equality is equity." Let us see. All the authorities cited by the solicitors for the judgment creditors upon this point, refer to the common-law rule regulating the distribution of the assets of insolvent decedents' estates.

But that rule is not in force in this State, because it has been superseded by the provisions of our own statute in relation to the same subject. Although our statute and the common law may agree in many particulars, yet that fact does not give them concurrent authority — the one must be treated not as a supplement to, but as an entire substitute for the other. Wherein the statute and the common law agree or differ touching a distinct subject, the statute must prevail. Also, if the Legislature undertakes to provide for the regulation of human conduct in respect to a specific matter or thing already covered by the common law, and parts of which are omitted from the statute, such omissions may be taken generally as evidences of the legislative intent to

repeal or abrogate the same.  Take for example our own
Statute of Frauds.   It does not contain some of the
provisions of the English statute, but the omitted por-
tions thereof, for the reasons before stated, have never
been held to be in force in this State, since the enact-
ment of our own statute.

Now, if our mode of distributing the assets of deceased
persons is to control the apportionment of the fund rep-
resenting the outstanding accounts of the debtor cor-
poration, we must look to our own statute, and not to
the common law, as the source of our guidance and
direction.

At this point another inquiry arises.   Do the pro-
visions of our statute apply?   Surely not.   If the fund
in controversy had been brought into this court by an
executor or administrator, on a creditor's bill or in some
other way, it would have to be distributed according
to the directions of our own statute, which does prefer
judgment over simple contract creditors.   But it was
not brought here by such an officer.   It was deposited
in the registry of this court by the receiver of the Lord
& Polk Chemical Company, who was appointed under
an act which relates exclusively to insolvent corporations
and which does not prescribe the order in which its debts
shall be paid.

The analogy between the duties of this receiver and
the duties of an assignee under a voluntary assignment
in bankruptcy, is certainly more striking than the anal-
ogy between his duties and those of an administrator.

And if we are to look for a rule outside of the prin-
ciple of equity to regulate the distribution of funds like
that with which we are now dealing, and as to which our
Code is absolutely silent, we might turn with more favor

to the provision of our insolvent act relating to voluntary assignments which directs a *pro rata* distribution of the assets of the assignee among all his creditors, than we could to the statute in regard to the settlement of personal estates. Why? Because the conditions are more nearly alike and the modes of distributing assets the same. But however complete the likeness or analogy in these respects we cannot call to our aid this statute in solving the problem involved in the apportionment of this fund.

In such cases we must be guided in our determinations by the rules of equity.

When the Legislature authorized the Chancellor, upon the application of a stockholder or creditor of an insolvent corporation, to appoint a receiver therefor without any directions as to his duties, or as to the distribution of its assets, it was their intention, no doubt, that the mode of winding up the business affairs of such institutions would be the one that is recognized and acted on in a court of equity in similar cases.

Certainly in the absence of a statutory provision adopting a different mode, the equitable one would obtain.

The maxim " equality is equity " is very much favored in this court, and whenever the circumstances arise to justify its application, it is never reluctant to give the desired relief. Why should one creditor, irrespective of the form or grade of his debt, be entitled to any more consideration than another? The law makes a distinction, it is true, but equity looks not so much at the form of a debt as to the good faith in which it was made or created. What matters it whether a debt is evidenced by a bond or due bill, by a note or book account, the obligation or duty to pay it is just the same. And it is

this principle that a court of equity takes into account, in putting debts of all grades upon the same common level.   I know it is urged that those who have procured the higher evidences of indebtedness are considered as having displayed greater diligence and as a reward therefor the law gives them a preference according to the rank or grade of the debt.   Equity, however, imputes no particular merit to diligence unless the advantage thereby acquired amounts to a lien or some vested right or interest which neither equity nor law will allow to be disturbed.

A paragraph from Pomeroy's admirable treatise on " Equity Jurisprudence " is very instructive on this point.   He says:   "Another remarkable and most just application of the principle," referring to the maxim " equality is equity," " often leading to results very different from those produced by the operation of legal rules, may be seen in all those instances where a court of equity acquires jurisdiction from any cause to wind up, distribute or settle an estate, property or fund against which there are a number of separate claimants.   One example is that of settling the affairs of an insolvent partnership, corporation or individual debtor in a creditor's suit brought by one on behalf of all other creditors, where the assets are not sufficient to satisfy all demands in full; the court always proceeds on the principle that ' equality is equity,' and of apportioning the property *pro rata* among all the creditors."

This is a very broad statement of the principle and must be taken subject to the limitations embraced in other fundamental maxims and principles equally clear and imperative, in their application previously alluded to in other parts of this opinion.