**NEW YORK STOCK EXCHANGE, an unincorporated association under the laws of the State of New York, Plaintiff,**

v.

**PICKARD & COMPANY, INCORPORATED, a corporation of the State of Delaware, Defendant.**

Court of Chancery of Delaware, New Castle.

Aug. 31, 1972.

See also, Del.Ch., 282 A.2d 651.

William H. Uffelman, Jr., of Theisen & Lank, Wilmington, for receiver, Aubrey B. Lank.

Michael D. Goldman, of Potter, Anderson & Corroon, Wilmington, for New York Stock Exchange.

Courtney H. Cummings, Jr., of Killoran & Van Brunt, Wilmington, and John M. Burns, III, of Spear & Hill, New York City, for Jean B. Fischer, C. Fink Fischer, Adelaide V. Ours and Statton R. Ours.

Gerrit L. Lansing, Col. Thomas H. Magness, Jr., Joseph V. Shields, Jr., John A. Schwarz, Jr., and George F. Wittich, pro se.

DUFFY, Chancellor:

The issue for decision involves claims to priority among subordinated lenders to a corporation now in an insolvency receivership.

A.

Pickard and Co., Inc., a Delaware corporation, (Pickard) was a registered stockbroker and investment adviser and a member of the New York Stock Exchange (NYSE). On September 29, 1967 Haskins & Sells, independent public accountants, began an audit of Pickard for the purpose of a routine report to NYSE. In January 1968 the accountants reported to NYSE that they were unable to complete the audit because of deficiencies and inaccuracies in Pickard's books and records.

On May 1968 an agreement was made between Pickard and NYSE whereby moneys from the latter's Special Trust Fund would be advanced for the purpose of liquidating Pickard's customer accounts, and an Exchange appointed liquidator would take control of Pickard's property and business for the purpose of winding up its business. That arrangement continued until April 22, 1969 when, upon petition by NYSE, this Court appointed a Receiver for Pickard under 8 Del.C. § 291 (the insolvency statute).

B.

At the time of the Receiver's appointment there were twenty individuals ("subordinated lenders") whose loans to Pickard were subordinated under one or more of three types of instruments.

On May 1, 1970 the Court ordered that all creditors, subordinated lenders and stockholders file claims on or before July 31, 1970 or be forever barred. Three subordinated lenders did not file within the allowed time and their claims are thus barred. All other subordinated lenders filed claims including claims to priority over other subordinated lenders. Upon petition of the Receiver the Court directed the subordinated lenders to file statements of their positions as to priorities among themselves. Evidentiary hearings were then held.

Arguments by the subordinated lenders on the priority issue make two basic points: (1) The agreements are void and

the lenders are therefore general creditors, and (2) if the agreements are enforceable, then there ought (or ought not) to be priorities among subordinated lenders, based upon such considerations as order of maturity dates and/or the relationship of the lender and the corporation.

The lenders who claim that the agreements are not enforceable attack them on grounds of fraud or failure of conditions to the agreements.

The common theory of those who argue fraud is that Pickard falsely represented its financial status in inducing them to lend assets and to subordinate their claims to those assets. As a further ground of fraud peculiar to his case, one of the lenders, Shields, claims that it was falsely represented to him by Pickard and by Fischer and Ours that those claimants had each loaned to Pickard an additional amount equivalent to the amount he advanced; it is undisputed that they had not in fact done so.

Some of the lenders claim that conditions peculiar to their respective agreements failed and that they are therefore not bound by them. Thus, the Fischers and the Ours assert that the last agreements extending the maturity dates of their subordination agreements were subject to the condition that Pickard would not incur further unsecured debt unless it were subordinated to theirs, and they say that Pickard violated that condition. Shields also claims that his agreement was entered into under duress, i. e., that NYSE "ordered" him to do so, on pain of discipline.

The lenders disagree as to whether there ought to be priorities *inter sese* if the agreements are found to be enforceable. The positions advanced are: (1) There are no priorities, on the theory that each of the lenders agreed to subordinate to each of the others; (2) there are no priorities, except over officers, directors or voting shareholders of Pickard, and their close relatives, because of their fiduciary duty to the corporation; (3) there are priorities in order of Maturity Dates; this implies that it was not the intent of the parties that lenders be subordinate to later subordinated lenders.

Certain lenders claim that even if the agreements are enforceable, nevertheless their claims are not subordinated, because the conditions under which the agreement to subordinate became operative (i. e., insolvency) did not occur on or prior to the maturity date. The theory of such lenders is that after the maturity dates passed, they ceased to be subordinated lenders and became general creditors of Pickard.

The Receiver takes the position that all of the subordination agreements are valid and enforceable, but he takes no position in regard to priorities among the subordinated lenders.

### C.

The ultimate issue among these lenders, of course, concerns how they should share in any distribution which might be made of Pickard's assets amounting to less than 100% of the claims. To reach that question several issues eventually must be resolved:

(1) Are the agreements enforceable against all, or any, of the lenders?

(2) If the agreements are enforceable, are the subordination provisions operative as to all, or any, of the lenders?

(3) If the agreements are enforceable and the subordination provisions are operative, are there priorities among the subordinated lenders?

■ The precise and only question now before this Court is the last of these three. The arguments made by many of the claimants seek to avoid the effect of the subordination agreements either by denying their enforceability (on the grounds of fraud) or by denying that the condition (insolvency) occurred under which the

lender agreed to subordinate his claim. Those who advance such arguments assert that they are not subordinated lenders; they want to be classified as general creditors. But that was not the issue before the Court. The order of January 25, 1971 which fixed the hearing specifically stated that it would be held "to determine the priority of payment among all subordinated lenders." Indeed, NYSE, which is a general creditor, was specifically excluded from the hearings. A decision elevating any or all of these lender—claimants to the status of general creditors would obviously affect NYSE's participation in any distribution of assets to general creditors. Thus, due process requires that NYSE be given an opportunity to be heard and to participate in an evidentiary hearing on the status issue. This decision is therefore limited to the narrow question of priorities among subordinated lenders, only. I conclude that there are no priorities, and that all subordinated lenders will share ratably in any distribution to that class of claimant.

### D.

■■ As a general rule, there are no priorities among general creditors—"equality is equity." In re Lord & Polk Chemical Co., Del.Ch., 7 Del.Ch. 248, 44 A. 775 (1895); 3 Clark, Law and Practice of Receivers §§ 667.4, 802.20(a) (3d ed.). The lenders here are account, note and bond creditors and in the absence of subordination agreements, they would be general creditors; in that status there would be no priorities among them and each would be entitled to a pro rata share of any distribution made to the class. Blair v. Clayton Enterprise Co., Del.Ch., 9 Del.Ch. 95, 77 A. 740 (1910). The problem is, therefore, to determine what effect the agreements have upon the equality which each of the lenders would otherwise have.

■■ Any priority among claimants of the same class must be founded upon a statute or upon the operation of some general rule of law. If a claimant seeks priority based upon general equitable principles, he must demonstrate something in the intrinsic nature of his claim which confers upon him an equity superior to those of competing claimants of the same class. 75 C.J.S. Receivers § 283. There is no statute applicable here. Therefore, if any priorities exist among the lenders, they must arise out of the legal relations created by the agreements, either from the nature of such agreements generally or from the express terms thereof.

■ Subordination agreements are uniformly enforced by the courts in insolvency and bankruptcy proceedings, 3A Collier on Bankruptcy, § 65.06 (14th ed.), but there are several different views as to the nature of such agreements. Calligar, Subordination Agreements, 70 Yale L.J. 376, 383–392 (1961). The better theory, which I adopt here, is that the agreements are contracts and the Court has the power to distribute the insolvent estate in accord with the rights of the parties as fixed by their own contract. See, e. g., In re Aktiebolaget Kreuger & Toll., 96 F.2d 768 (2d Cir., 1938); Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371 (8th Cir., 1935).

■ Generally speaking, a subordination agreement is simply a contract in which a creditor (the "subordinated" or "junior" creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor. Calligar, Subordination Agreements, *supra*. The contracting parties may include the senior creditor or, as here, the contract may be between the debtor and the subordinated creditor for the benefit of the senior creditor. Unless the specific terms of the contract provide otherwise, the contract's effect runs only between the subordinated creditor and the senior creditors, i. e., the subordination of the junior creditor's right to payment until after the senior creditor has been paid. The contract does not change the

subordinated creditor's basic status as a general creditor, except insofar as he is bound by his contract. Such an agreement does not by its general nature imply any system of priorities among the subordinated creditors. In other words, each simply stands as a general creditor entitled to a ratable share of any distribution, subject to the rights of senior creditors as specified in the agreement.

Applying these principles to this case, the determinative question is: How do these creditors stand in relation each to the other in terms of junior and senior creditors? To whom did each junior creditor agree to subordinate his claim? We must now turn to the agreements.

The relevant terms of the agreements are substantially as follows:

" . . . the Customer does hereby irrevocably . . . subordinate any and all claims with respect to said account or accounts . . . to the claims of *all other present and future creditors* of the Corporation arising out of any matters occurring prior to . . . Maturity Date . . . the Customer shall not be entitled to participate or share, ratably or otherwise, in the distribution of the assets of the Corporation until all claims of *all other present and future creditors* of the Corporation arising out of any matter occurring prior to the Maturity Date have been fully satisfied, or provisions have been made therefor." [Emphasis added.]

The language is plain and comprehensive: the lender agrees to subordinate his claim to the claims of all other creditors, if the creditor's claim arose out of any matter occurring prior to the lender's Maturity Date. The agreement simply does not permit the inference of an implied exception to subsequent subordinated lenders.

Clearly the subordinated lenders are creditors of Pickard within the meaning of the quoted language. The question, then, is whether their claims arose out of matters occurring prior to the maturity date of each other subordinated lender.

 The subordinated lenders' claims are for repayment of the debts which their accounts represent or which arose from loans of securities or cash to Pickard. Thus, the creation of the debt is the matter out of which the lenders' claims arise. The earliest maturity date was February 1, 1968. All of the debts upon which these claims are based occurred prior to that date. Therefore, each of the subordinated lenders is a creditor to whom all other subordinated lenders agreed to subordinate their claims. The result is that all stand in an equal relation in regard to their rights to the proceeds of any distribution. Therefore, there are no priorities among those who are subordinated lenders, and each should share ratably in any distribution made to subordinated lenders.

### D.

I now turn to the question of whether priority should be given to the other subordinated lenders over Pickard's officers, directors, voting shareholders, and their close relatives.* (For convenience, these are all hereafter referred to as "directors"). The reason argued in favor of this position is that such persons were in a position of trust in respect of Pickard and the inference, of course, is that these parties have breached that trust. The argument, in effect, seeks a postponement of director claims.

 The general rule regarding postponements is that the reason for a postponement must arise from some relationship between the debtor and the claiming

* John A. Schwarz, Jr., and Joseph V. Shields were voting shareholders, officers and directors of Pickard. Schwarz maintains that his election was invalid; this *informational footnote is not to be taken* as a ruling on the merits of that contention. Mrs. Helen Shields Guest, Joseph Shields' sister, is a subordinated lender and a claimant.

creditor so that payment of such creditor in competition with other creditors would be "inequitable," either because he is estopped to assert his claim, or because the claim arises out of some act which would be fraudulent as to the other creditors. See 3A Collier on Bankruptcy, § 63.08 (14th ed., 1971); Needham v. Bickford, 83 F.2d 756 (1st Cir., 1936), cert. denied 299 U.S. 560, 57 S.Ct. 21, 81 L.Ed. 412 (1937); In re Bowman Hardware & Electric Co., 67 F.2d 792 (7th Cir., 1933). The rationale of the rule is the equitable doctrine that he who comes into equity must come with clean hands.

 The relationship of a director to a corporation is not, in and of itself, such a relationship as would justify denial or postponement of the director's claim in an insolvency proceeding. Collier, *supra*, § 63.06 [5.3]. Therefore, no priority is to be given to other subordinated lenders based merely upon the director's status as such. But the courts subject the claims of directors to careful scrutiny and insist that their *bona fides* be conclusively established. Collier, *supra*, § 63.06 [5.3].

 I am satisfied that the claims of the directors here are based upon *bona fide*, arm's length transactions between them and Pickard. At worst (on the basis of the present record) it appears that these loans were made in a desperate effort to shore up a staggering corporation. The law is that directors are not compelled to stand by while the corporation flounders; they may make loans in good faith in an effort to keep the concern going. Payment of the directors' claims based upon such loans is not inequitable to other subordinated lenders. Nor is the mere fact that the directors may have known that the corporation was in financial difficulty such a circumstance as will estop them from asserting their claims, although it may well preclude them from avoiding their agreement on the grounds that Pickard's financial condition was fraudulently misrepresented to them.

 It follows that priorities over director claims will not be allowed. And, *a fortiori*, priorities will not be allowed over the claims by officers, voting stockholders and close relatives. In making this ruling I emphasize that it is not to be regarded as a decision on directors' liabilities, if any, for breach of fiduciary duties not related to the loans. And, if it is eventually determined that a fraud was perpetrated upon subordinated lenders, then the claim of any party who participated in that fraud will be barred.

E.

 Finally, I consider the contention of the Fischers and the Ours that the transfer of assets (which they claim belong to them) to a custodian constitutes a valid preference to them. It was held in Asmussen v. Quaker City Corp., Del.Ch., 18 Del. Ch. 28, 156 A. 180 (1931) that a corporation may distribute its assets to some creditors in preference to others so long as it is not in receivership, but that rule has a limited application where the claim is by a director-debtor. Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co., Del.Ch., 20 Del.Ch. 220, 174 A. 112 (1934). I need not decide whether such a limitation binds the Fischers or the Ours because transfer of assets to the custodian was not a payment or distribution to them. The parties to the agreement plainly agreed to place the assets in the custody of a third party until the question of rights to them had been resolved. There was no payment, no transfer of possession, control or legal or beneficial title to the lenders. Therefore, no preference was created.

Order on notice.