WILLIAM S. POTTER, Receiver of Consolidated Management
Association, a corporation of the
State of Delaware,

*vs.*

SANITARY COMPANY OF AMERICA, a corporation of the
State of Delaware.

*New Castle, July* 13, 1937.

*William S. Potter,* for himself as Receiver of Consolidated Management Association.

*Ivan Culbertson,* for defendant.

THE CHANCELLOR: Consolidated Management Association, herein called Consolidated, is in receivership in this court. A receiver was appointed for it on the ground of insolvency on March 15, 1933.

Sanitary Company of America, herein called Sanitary, is a corporation of this State. It has an authorized issue of no-par-value common stock of seventy-five hundred shares, of which seventy-three hundred are outstanding. It has also an issue of preferred stock. Control is lodged in the common stock.

Before and at the time of the receivership, Consolidated owned forty-five hundred shares of Sanitary common stock. Thus Consolidated was in a position of absolute control over Sanitary.

James Keenan, Russell P. Brewer and Harvey W. Marvin were in control of Consolidated and thereby in control of Sanitary. They were all of the directors of Consolidated, and composed a majority of the board of Sanitary and therefore controlled it. Keenan and Brewer were the president and secretary-treasurer respectively of the two corporations. For more detail of fact in this connection, see *Eshleman, et al., v. Keenan, et al.,* 21 *Del. Ch.* 259, 187 *A.* 25.

Consolidated is a holding company, Sanitary an operating one. If Keenan and Brewer were interested in controlling Sanitary and thereby enjoying the power and emoluments incident thereto, it is apparent that it would be decidedly more to their advantage and security to have their control arise directly out of the voting power of a majority of the stock of Sanitary, than indirectly through control of Consolidated, which, until the sale by Consolidated of the twenty-five hundred shares here complained against, owned a clear majority of Sanitary's common stock. The bill charges that the sale of that amount of stock by Consolidated was not only at an inadequate price, but that its result was to transfer the control of Sanitary from Consolidated to a group of Sanitary stockholders who were in concert with Keenan and Brewer for the purpose of perpetuating those gentlemen in control of Sanitary's affairs. This, it is charged, was in violation by Keenan and Brewer, a majority of Consolidated's board, of the fiduciary duty which they owed to that corporation.

It is quite true that Keenan and Brewer as voting trustees of Consolidated's stock were already before the sale of stock here complained against, in command of Sanitary's affairs. The voting trust under which they acted was created in February, 1924, before the amendment legalizing voting trusts for the limited period of ten years was enacted in 1925 (34 *Del. Laws, c.* 112). The voting trust was of indefinite duration—so long as any preferred stock of three companies therein named (Sanitary being one) should be outstanding. It is apparent that after the amendment of 1925 was enacted legalizing voting trusts for a restricted period of ten years, a serious question would arise at almost any time concerning the legality of the particular voting trust that secured Keenan and Brewer in their position of control over Consolidated and, through it, over Sanitary. If the trust was totally void, the control would be gone. If it lasted for the statutory limit of ten years, it

would, as of May, 1932, soon expire. Whether because of these considerations, Keenan and Brewer were aware of the possible precariousness of their security as voting trustees and consequently of their control over Sanitary, I am unable to say. They may have been. They ought to have been.

At all events, aside from any question marks with which the amendment of 1925 might punctuate their voting trust agreement, it would be a common sense view for any one to take, whether lawyer or layman, that power which rested for its foundation on voting rights incident to stock ownership is much more secure than power which derives from an office of trust. If power can draw its strength from both sources, it is well nigh impregnable against attack, except of course where its inequitable exercise is charged.

It is, therefore, quite plain that if Keenan and Brewer desired to fortify themselves in control of Sanitary, their purpose in that regard would be measurably promoted by so arranging matters that direct stock control of Sanitary should be transferred from Consolidated to themselves alone or to themselves and others who were responsive to their influence.

Now how did the sale of twenty-five hundred shares of Sanitary stock to Sanitary itself contribute to that transfer of direct stock control of Sanitary from Consolidated to the Keenan-Brewer group? There being seventy-three hundred shares of Sanitary outstanding, it follows that when Sanitary acquired twenty-five hundred of its own shares, the outstanding common stock thereafter entitled to vote for Sanitary directors was only forty-eight hundred, of which twenty-four hundred and one shares would of course be a majority. Of the forty-eight hundred shares entitled to vote, Keenan held six hundred and fifty-nine, Brewer five hundred and thirty-three, Marvin fifty, and Ritter eleven hundred and eight. The total is twenty-three

hundred and fifty shares, not quite a majority, but for practical purposes a working control. If another one hundred and fifty shares which Sanitary sold out of its treasury stock on September 26, 1932, to a close friend of Brewer should remain friendly to the group, the working control will become an absolute one. That the four persons above named composed an harmonious group having a common cause and purpose, I think cannot be questioned. They were united in preserving the *status quo* of the Keenan-Brewer dominance in Sanitary's affairs. Evidence in other cases which I have heard, if I am allowed to notice those other cases in this one, shows it; and independent evidence in this case likewise shows it. One piece of evidence in the present case rather convincingly demonstrates it. That evidence is this—that when on at least two occasions one of the Keenan-Brewer group bought a block of Sanitary stock, he allocated some of it for acquisition by the others.

The bill charges and the answer admits that the twenty-five hundred shares were sold by Consolidated to Sanitary on or about May 10, 1932. That, however, cannot be true, because the minutes of Sanitary show that no purchase of its own stock was authorized prior to May 31, 1932. On that date the board resolved to purchase not twenty-five hundred shares, but only twelve hundred and fifty shares at the rate of two dollars per share. It was also given an option to purchase another twelve hundred and fifty shares at the same price, the option to be exercised within one hundred and twenty days from April 27, 1932.

This matter of purchasing its own stock first arose in 1932 apparently as the result of an offer by Ritter, who had just recently purchased one thousand shares at two dollars per share, to sell to Sanitary twelve hundred and fifty of its shares at that price, with an option to it to purchase five hundred more shares at the same rate. The reason for Ritter's offer was, as stated in his communication, in

order that Sanitary might acquire the stock at a low price and thereby prepare itself in advance to meet the redemption obligations to preferred stock hereinafter mentioned. The directors did not accept Ritter's offer. Instead they turned to Consolidated to secure from that source the twelve hundred and fifty shares which were to be held to meet the redemption obligations owed to the preferred, and also an option upon twelve hundred and fifty more shares. Consolidated whose spokesmen were virtually the same individuals who spoke for Sanitary, consented to sell twelve hundred and fifty of the forty-five hundred shares which it held and granted a one hundred and twenty day option on another twelve hundred and fifty shares.

The avowed purpose of the acquisition of twelve hundred and fifty shares from Consolidated was to put in the treasury of Sanitary enough of its own common shares to take care of the common stock bonus which the charter required should be given to the preferred at the time of its redemption—one-fourth share of common for each share of preferred. Sanitary was, at the time when the purchase was resolved upon, losing money on its daily operations. A purchase of common stock in contemplation of the redemption of the preferred stock was an exhibition of long range optimism, such was the condition of Sanitary's affairs. But the laying out of Sanitary funds in contemplation of that future event, however distant it may have appeared to be, might perhaps be justified, notwithstanding the company's then financial situation, on the score of prudent business foresight, sufficiently at least to rebut any charge of an ulterior purpose on the part of the directors and officers common to the selling and buying companies.

Conceding that it might be justified to that extent, it is difficult to understand why the directors of Sanitary did not accept the offer from Ritter. Why did they turn from Ritter whose stock might be purchased on as favorable

terms as Consolidated's, and in an amount sufficient to meet the requirements of the avowed purpose, and purchase it from Consolidated? Was it because of a desire to whittle down the block of stock which Consolidated held and thereby reduce it nearer to the point where it would cease to constitute a voting majority in meetings of Sanitary stockholders?

It is a suspicious circumstance that the directors of Consolidated who of course, by reason of their positions in Sanitary, knew of the Ritter offer, were willing to permit Consolidated rather than Ritter to supply the stock for Sanitary's alleged needs. That the stock was not a bad purchase at two dollars per share was evidently the opinion of Consolidated's directors, for they personally bought other stock at that price, at about the same time. In the judgment of the directors of Consolidated the stock was apparently a good stock for that company to sell at two dollars per share, and, a good stock for themselves as individuals to buy at the same figure.

I just referred to what I called a suspicious circumstance. It is suspicious as indicating that the motive which actuated the common directors was not perhaps the professed one of providing for Sanitary's perferred stock redemption requirements, but rather a motive to reduce the voting power of Consolidated in Sanitary's stockholders' meetings.

This suspicion is heightened by yet another circumstance. I refer to the fact that Sanitary exercised its option to acquire from Consolidated the other twelve hundred and fifty shares as Consolidated's offer permitted it to do. Now while, notwithstanding Sanitary's business condition was far from flourishing, it may nevertheless have been the course of prudent management to employ liquid cash in providing for distant preferred stock redemption, and so the purchase of the first twelve hundred and fifty shares

may have been warranted, what can be said of the expenditure of twenty-five hundred dollars more of cash in the acquisition of the other twelve hundred and fifty shares? There is no pretense that they were needed for future preferred stock redemption. Why, in view of the reduced state of the Sanitary's business, the necessity of curtailment of expenses all around which the minutes of its directors disclose, and the daily progress of its losses, did its officers reduce its cash position by another twenty-five hundred dollars laid out in the purchase of its own stock? To be sure twenty-five hundred dollars is not a large sum. But it was a substantial sum for this relatively small company with its business running into the red, as the saying is, every week. I just asked why did the officers of Sanitary lay out that additional money in that way? "Officers" was used advisedly, for I can find nowhere in the minutes of Sanitary when the directors ever authorized the purchase. They authorized the first purchase, but not the last one.

The officers, one or all of them, without authority from the board made the last purchase. The officers are the same individuals who were also officers of Consolidated. As officers of Consolidated they reduced that corporation by the sale to the position of a minority stockholder, and as officers of Sanitary by two acts, one of which was not authorized by the board, they caused that company to make purchases of its own stock in such an amount that, by reason of the stockholdings of their own group, they were firmly in control of Sanitary's affairs in their individual rights. That control was shifted to themselves from Consolidated whose officers and dominant directors they were. The property of the two corporations which they dominated was so used by them— the stock which was held by one and the cash which was owned by the other—as to perpetuate their control over the subsidiary in which they held important stock interests. Before, they were in a minority; now, they are in a safe majority, in that subsidiary.

Thus far it looks very much like a case where officers in possession of corporate power used that power to advance their own individual ends.

But the evidence pointing to that conclusion has not yet all been completely recited. There is more evidence which has a significant bearing on the motives of Consolidated's officers in authorizing a sale that lost it the control of Sanitary. The evidence is uncontradicted that negotiations to buy all or a substantial part of Sanitary stock held by Consolidated were opened by parties other than Sanitary. The earliest negotiation was as far back as 1926. All the negotiations were from persons who appeared to be seeking to secure control of Sanitary. The officers of Consolidated were the same persons when such negotiations were opened as when the sale was authorized to Sanitary. Notwithstanding the inquiries indicated the possibility of a price to Consolidated as high as twenty-five dollars per share, the officers, so far as the evidence shows, rather summarily spurned the attempted negotiations. In the course of one of such attempted negotiations in 1932, not long before the sale to Sanitary of the twenty-five hundred shares at two dollars per share, the Keenan-Brewer group named a price of fifty dollars per share at which they were willing to sell their own holdings of close to twenty-five hundred shares. This would seem to be a fanciful figure if intrinsic value were considered. It is reasonably explicable as an indirect way of stating that they could be induced to withdraw themselves from the Sanitary enterprise only for a highly attractive consideration.

It is not deemed necessary to review the evidence touching any of the negotiations with Consolidated's officers, except the last one, which was opened and rejected in 1932. It appears that what may be referred to as the Mott interests were particularly desirous of acquiring the entire forty-five hundred shares of Sanitary stock owned by Con-

solidated. For reasons that need not be recited, control of Sanitary's plants and business was desired by the Mott people. One Osmond, who had participated in the previous offers to buy, was particularly anxious that Mott should buy Consolidated's forty-five hundred controlling shares, because his stock, then totalling about twelve hundred shares, would be purchased in part at least at the same price which Mott paid for Consolidated's shares. Accordingly Osmond lent his aid in the Mott endeavor to purchase the block held by Consolidated. Without going into details, it is sufficient to say that Consolidated, dominated by the group heretofore referred to, summarily rejected the Mott offer of fifteen dollars per share for the entire forty-five hundred shares. It was then that the group asked fifty dollars per share for its own holdings, as before stated.

It is not denied that fifteen dollars was offered and rejected in January, 1932. It is because of this offer that the complainant contends that the price of two dollars per share which Consolidated received only a few months later was a grossly inadequate price. The offer was made by Mr. Streeper, a member of the Philadelphia, Pa., bar, with whom Osmond cooperated. It was a cash offer. It was made in behalf of J. Varnum Mott who desired to get control of Sanitary in connection with a Mott foundry near Trenton, New Jersey. The offer was made by Streeper to Keenan and Brewer in the office of Consolidated at Wilmington.

The offer was never accepted though it remained open for a year or more after it was made, in the early part of which period the sale was made to Sanitary. The defendant argues that Mott was not a financially responsible person. If cash was to be paid, it is not apparent what relevancy Mott's financial responsibility had to the matter. If it was a good thing for Consolidated to sell one-half of its Sanitary stock in May, 1932, for two dollars a share and thereby reduce itself to a minority position in Sanitary, it would

seem that four months earlier it would have been a much more desirable thing to sell all of its Sanitary stock at fifteen dollars per share. Yet the better offer was not accepted. Indeed, so far as the evidence shows, it was not even seriously considered. This is hard to understand from the viewpoint of Consolidated's interest. It is, however, easily understandable if the fifteen dollar rejection and the later two dollar acceptance are examined in the light of a purpose on the part of Keenan and his associates to turn the control of Sanitary away from their corporation, Consolidated, to themselves as individuals.

The only testimony the defendant has offered relates to the value of Sanitary stock when it was sold to Sanitary. That testimony is that recent sales of the stock showed it to have a market of not over two dollars per share. Hence, they say, the price received by Consolidated was a fair price. But even a fair price cannot justify corporate officers in making a sale if the purpose and effect of the sale is to advantage themselves either in position, power or profit to the disadvantage of the corporation they represent.

Was the price, however, a fair one in view of the circumstances? The defendant refuses to allow any value to Consolidated's block of Sanitary stock on account of the control of Sanitary which the block carried. In this they are wrong. Streeper's offer of fifteen dollars was based on the control feature of the shares. Besides, if the stock was worth only two dollars a share, so much more attractive to Consolidated was the Streeper offer of fifteen dollars per share. But the offer aroused no interest.

I have in the foregoing discussed in perhaps tedious detail the fact aspects of this case and the result which has flowed therefrom and have endeavored to discover the purposes and motives of the persons acting in dual capacities who shaped the facts and produced the result.

It is now in order to notice the principle of law applic-

able to the case. It has been stated in many cases but in none better than by Mr. Justice Pitney in *Corsicana National Bank v. Johnson,* 251 *U. S.* 68, 40 *S. Ct.* 82, 91, 64 *L. Ed.* 141. In that case he announced the principle as follows:

"Was there good cause for the rescission? The fact that the same persons were directors and managers of both corporations subjects their dealings *inter sese* to close scrutiny. That two corporations have a majority or even the whole membership of their boards of directors in common does not necessarily render transactions between them void; but transactions resulting from the agency of officers or directors acting at the same time for both must be deemed presumptively fraudulent, unless expressly authorized or ratified by the stockholders; and certainly, where the circumstances show, as by the undisputed evidence they tended to show in this case, that the transaction would be of great advantage to one corporation at the expense of the other, especially where, in addition to this, the personal interests of the directors, or any of them, would be enhanced at the expense of the stockholders, the transaction is voidable by the stockholders within a reasonable time after discovery of the fraud. *Twin-Lick Oil Co. v. Marbury,* 91 *U. S.* 587, 589, 23 *L. Ed.* 328; *Wardell v. Railroad Company,* 103 *U. S.* 651, 657, *et seq.,* 26 *L. Ed.* 509; *Thomas v. Brownville, &c., R. R. Co.,* 109 *U. S.* 522, 524, 3 *S. Ct.* 315, 27 *L. Ed.* 1018; *Richardson v. Green,* 133 *U. S.* 30, 43, 10 *S. Ct.* 280, 33 *L. Ed.* 516; *McGourkey v. Toledo & Ohio Ry. Co.,* 146 *U. S.* 536, 552, 565, 13 *S. Ct.* 170, 36 *L. Ed.* 1079."

The transaction of sale between Consolidated and Sanitary cannot stand the test of close scrutiny which this salutary rule demands. The lengthy discussion heretofore engaged in discloses my reasons for that statement. The complainant should be afforded relief as prayed.

Decree accordingly.