Georges MARCIANO, Maurice Marciano,
Armand Marciano, and Paul
Marciano, Plaintiffs Below, Appellants,

v.

Joe NAKASH, Ralph Nakash, Avi Nakash
and Gasoline, Ltd., a Delaware corpora-
tion, Defendants Below, Appellees.

Supreme Court of Delaware.

Submitted: July 7, 1987.
Decided: Dec., 23, 1987.

by Ari, Joe, and Ralph Nakash (the "Nakashes") and fifty percent by Georges, Maurice, Armand and Paul Marciano (the "Marcianos"). The Vice Chancellor ruled that $2.5 million in loans made by the Nakashes faction to Gasoline were valid and enforceable debts of the corporation, notwithstanding their origin in self-dealing transactions. The Marcianos argue that the disputed debt is voidable as a matter of law but, in any event, the Nakashes failed to meet their burden of establishing full fairness. We conclude that the Vice Chancellor applied the proper standard for review of self-dealing transactions and the finding of full fairness is supported by the record. Accordingly, we affirm.

I

The factual basis underlying the contested loans was fully developed in the Court of Chancery. The liquidation proceeding marked the end of a joint venture launched in 1984 by the Marcianos and the Nakashes to market designer jeans and sportswear. Through a solely owned corporation called Guess? Inc. ("Guess"), the California based Marcianos had been engaged in the design and distribution of stylized jeans for several years. In 1983 they decided to form a separate division to market copies of Guess creations in a broader retail market. In order to secure financing and broaden market exposure the Marcianos entered into negotiations with the New York based Nakash brothers, the owners of Jordache Enterprises, Inc. a leading manufacturer of jeans. Ultimately, it was agreed that the Nakashes would receive fifty percent of the stock of Guess for a consideration of $4.7 million. As a result, the three Nakash brothers joined three of the Marcianos on the Guess board of directors.

Similarly, when Gasoline was formed, stock ownership and board composition was shared equally by the two families. Although corporate control and direction were equally divided, from an operational standpoint Gasoline functioned in New York under the Nakashes' operational guidance while the parent, Guess, continued under the primary attention of the

William O. LaMotte, III (argued), Thomas C. Grimm and Leone L. Ciporin of Morris, Nichols, Arsht & Tunnell, Wilmington, and Marshall B. Grossman, Robert A. Shlachter and John A. Schwimmer of Alschuler, Grossman & Pines, Los Angeles, Cal., Of Counsel, for appellants.

Joseph A. Rosenthal (argued) of Morris, Rosenthal, Monhait & Gross, Wilmington, and Blank, Rome, Comisky & McCauley, Philadelphia, Pa., of counsel, for appellees.

Before HORSEY, MOORE and WALSH, JJ.

WALSH, Justice.

This is an appeal from a decision of the Court of Chancery which validated a claim in liquidation of Gasoline, Ltd. ("Gasoline"), a Delaware corporation, placed in custodial status pursuant to 8 *Del.C.* § 226 by reason of a deadlock among its board of directors. Fifty percent of Gasoline is owned

Marcianos. Differences between the two factions quickly surfaced with resulting deadlocks at the director level of both Guess and Gasoline. The Marcianos filed an action, partly derivative, against Guess and the Nakashes in California followed by the Delaware proceeding in which the Marcianos sought the appointment of a custodian for Gasoline in addition to asserting derivative claims for diversion of corporate opportunities and assets arising out of the Nakashes' operation of Gasoline. Ultimately, the derivative aspect of the Delaware action was stayed in favor of the California proceedings and the Court of Chancery, after a court-ordered shareholder's meeting failed to resolve the director deadlock, appointed a custodian whose power was limited to resolving deadlocks on the Gasoline board.

The custodial arrangement failed to resolve the underlying policy differences between the two factions and neither group appeared willing to invest additional funds or provide guarantees to permit Gasoline to function as a viable commercial enterprise. In early 1987 the custodian advised the Court of Chancery that because of a lack of financing Gasoline had no prospects of continuation and recommended liquidation. A court-approved plan of liquidation authorized the custodian to sell the assets of Gasoline (with both the Marcianos and the Nakashes permitted to bid), pay all valid debts of the corporation and distribute the net proceeds to the shareholders. The determination of those debts, in particular the loan claims asserted by the Nakashes, was sharply disputed in the Court of Chancery and is the focus of this appeal.

The circumstances underlying the Nakashes' claim were determined by the Vice Chancellor following an evidentiary hearing. Prior to March, 1986, Gasoline had secured the necessary financing to support its inventory purchases from the Israel Discount Bank in New York. The bank advanced funds at one percent above prime rate secured by Gasoline's accounts receivable and the Nakashes' personal guarantee. Although requested to do so, the Marcianos were unwilling to participate in loan guarantees because of their dissatisfaction with the Nakashes' management. In response, the Nakashes withdrew their guarantees causing the Israel Discount Bank to terminate its outstanding loan of $1.6 million.

Without consulting the Marcianos, the Nakashes advanced approximately $2.3 million of their personal funds to Gasoline to enable the corporation to pay outstanding bills and acquire inventory. In June, 1986, the Nakashes arranged for U.F. Factors, an entity owned by them, to assume their personal loans and become Gasoline's lender. U.F. Factors charged interest at one percent over prime to which the Nakashes added one percent for their personal guarantees of the U.F. Factors loan. As of April 24, 1987, Gasoline's debt to U.F. Factors amounted to $2,575,000 of which $25,000 represented the Nakashes' guarantee fee. Another Nakash entity, Jordach Enterprises, also sought payment from Gasoline of two percent of the company's gross sales, or $30,000 for warehousing and invoicing services.

In November, 1986, the Nakashes had replaced the U.F. Factors loan, secured by a series of promissory notes executed by Gasoline, with a line of credit collateralized by Gasoline's assets including trademarks and copyrights. This action took place without the knowledge or consent of the custodian and was subsequently rescinded by the Nakashes. At the time of the court-ordered sale of assets, the Nakashes and their entities were general creditors of Gasoline. If allowed in full the Nakashes' claim will exhaust Gasoline's assets, leaving nothing for its shareholders.[1]

The parties agree that the loans made by the Nakashes to Gasoline were interested transactions. The Nakashes as officers of Gasoline executed the various documents which supported the loans and at the same time guaranteed those loans extended

---

1. The Nakashes used their $2.5 million claim as the basis for their liquidation bid ($1,000,101) for Gasoline's non-cash assets.

through their wholly owned entities. It is also not disputed that, given the control deadlock, the questioned transactions did not receive majority approval of Gasoline's directors or shareholders. The Marcianos argue that the loan transaction is voidable at the option of the corporation notwithstanding its fairness or the good faith of its participants. A review of this contention, rejected by the Court of Chancery, requires analysis of the concept of director self-dealing under Delaware law.

## II

It is a long-established principle of Delaware corporate law that the fiduciary relationship between directors and the corporation imposes fundamental limitations on the extent to which a director may benefit from dealings with the corporation he serves. *Guth v. Loft, Inc.*, Del. Supr., 5 A.2d 503 (1939). Thus, the "voting [for] and taking" of compensation may be deemed "constructively fraudulent" in the absence of shareholder ratification, or statutory or bylaw authorization. *Cahall v. Lofland*, Del. Ch., 114 A. 224, 232 (1921). Perhaps the strongest condemnation of interested director conduct appears in *Potter v. Sanitary Co. of America*, Del. Ch., 194 A. 87 (1937), a decision which the Marcianos advance as definitive of the rule of per se voidability. In *Potter* the Court of Chancery characterized transactions between corporations having common directors and officers "constructively fraudulent," absent shareholder ratification.

Support can also be found for the per se rule of voidability in this Court's decision in *Kerbs v. California Eastern Airways Inc.*, Del. Supr., 90 A.2d 652 (1952). The *Kerbs* court, in considering the validity of a profit sharing plan, ruled that the self-interest of the directors who voted on the plan caused the transaction to be voidable. The court concluded that the profit sharing plan was voidable based on the common law rule that the vote of an interested director will not be counted in determining whether the challenged action received the affirmative vote of a majority of the board of directors. *Id.* at 658 (*citing Bovay v. H.M. Byllesby & Co.*, Del. Supr., 38 A.2d 808 (1944)).

The principle of per se voidability for interested transactions, which is sometimes characterized as the common law rule, was significantly ameliorated by the 1967 enactment of Section 144 of the Delaware General Corporation Law.[2] The Marcianos argue that section 144(a) provides the only basis for immunizing self-interested transactions and since none of the statute's component tests are satisfied the stricture of the common law per se rule applies. The Vice Chancellor agreed that the disputed loans did not withstand a section 144(a) analysis but ruled that the common law rule did not invalidate transactions determined to be intrinsically fair. We agree that section 144(a) does not provide the only validation standard for interested transactions.

**2.** Section 144 of Title 8 *Del.C.* now provides:

    (a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if:

    (1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

    (2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

    (3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders.

    (b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorizes the contract or transaction.

■ It overstates the common law rule to conclude that relationship, alone, is the controlling factor in interested transactions. Although the application of the per se voidability rule in early Delaware cases resulted in the invalidation of interested transactions, the result was not dictated simply by a tainted relationship. Thus in *Potter,* the Court, while adopting the rule of voidability, emphasized that interested transactions should be subject to close scrutiny. Where the undisputed evidence tended to show that the transaction would advance the personal interests of the directors at the expense of stockholders, the stockholders, upon discovery, are entitled to disavow the transaction. *Potter,* 194 A. at 91. Further, the court examined the motives of the defendant directors and the effect the transaction had on the corporation and its shareholders. *Id.*

In other Delaware cases, decided before the enactment of section 144, interested director transactions were deemed voidable only after an examination of the fairness of a particular transaction *vis-a-vis* the non-participating shareholders and a determination of whether the disputed conduct received the approval of a noninterested majority of directors or shareholders. *Keenan v. Eshleman,* Del. Supr., 2 A.2d 904, 908 (1938); *Blish v. Thompson Automatic Arms Corp.,* Del. Supr., 64 A.2d 581, 602 (1948); *Kerbs,* 90 A.2d at 658. The latter test is now crystallized in the ratification criteria of section 144(a), although the non-quorum restriction of *Kerbs* has been superceded by the language of subparagraph (b) of section 144.

The Marcianos view compliance with section 144 as the sole basis for avoiding the per se rule of voidability. The Court of Chancery rejected this contention and we agree that it is not consonant with Delaware corporate law. This Court in *Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976), a post-section 144 decision, refused to view section 144 as either completely preemptive of the common law duty of director fidelity or as constituting a grant of broad immunity. As we stated in *Fliegler:* "It merely removes an 'interested director' cloud when its terms are met and

provides against invalidation of an agreement 'solely' because such a director or officer is involved." *Id.* at 222. In *Fliegler* this Court applied a two-tiered analysis: application of section 144 coupled with an intrinsic fairness test.

■ If section 144 validation of interested director transactions is not deemed exclusive, as *Fliegler* clearly holds, the continued viability of the intrinsic fairness test is mandated not only by fact situations, such as here present, where shareholder deadlock prevents ratification but also where shareholder control by interested directors precludes independent review. Indeed, if an independent committee of the board, contemplated by section 144(a)(1) is unavailable, the sole forum for demonstrating intrinsic fairness may be a judicial one. *See Merritt v. Colonial Foods, Inc.,* Del. Ch., 505 A.2d 757, 764 (1986). In such situations the intrinsic fairness test furnishes the substantive standard against which the evidential burden of the interested directors is applied. It is this burden which was addressed by this Court in *Weinberger v. UOP, Inc.,* Del. Supr., 457 A.2d 701 (1983):

> When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.
>
> \* \* \* \* \* \*
>
> The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.

*Id.* at 710.

This case illustrates the limitation inherent in viewing section 144 as the touchstone for testing interested director transactions. Because of the shareholder deadlock, even if the Nakashes had attempted to invoke section 144, it was realistically unavailable. The ratification process contemplated by section 144 presupposes the functioning of corporate constituencies capable of providing assents. Just as the

statute cannot "sanction unfairness" neither can it invalidate fairness if, upon judicial review, the transaction withstands close scrutiny of its intrinsic elements.[3]

## III

■ On the issue of intrinsic fairness, the Court of Chancery concluded that the "U.F. Factors loans compared favorably with the terms available from unrelated lenders" and that the need for external financing had been clearly demonstrated.[4] The Marcianos attack this ruling as factually and legally erroneous. Since the Vice Chancellor's factual findings were arrived at after an evidentiary hearing we are not free to reject them unless they are without record support or not the product of a logical deductive process. *Levitt v. Bouvier*, Del. Supr., 287 A.2d 671, 673 (1972). We find this standard to have been fully satisfied here.

■ Apart from the initial investment of $300,000 contributed equally by the Marcianos and the Nakashes, Gasoline's financial needs had been met through external borrowings. It is unnecessary to lay blame for the impasse which resulted in the Marcianos refusal to supply additional equity funding. It suffices to note that throughout 1985 and 1986, Gasoline was able to function only through cash advances from, and loans obtained by, the Nakashes, first through the Israel Discount Bank and later through U.F. Factors. During this period the evidence reflects the continued threat of bank overdrafts and inability to pay for purchases, particularly imported finished goods.

A finding of fairness is particularly appropriate in this case because the evidence indicates that the loans were made by the Nakashes with the *bona fide* intention of assisting Gasoline's efforts to remain in business. Directors who advance funds to a corporation in such circumstances do not forefeit their claims as creditors merely because of relationship. *New York Stock Exchange v. Pickard & Co., Inc.*, Del. Ch., 296 A.2d 143, 149 (1972). Further, in arranging for the loan, the interested directors were not depriving the corporation of a business opportunity but were instead providing a benefit for the corporation which was unavailable elsewhere.

The Marcianos argue that the Nakashes failed to demonstrate the full fairness of the loan transactions in two fundamental respects: the cost of the borrowings and the use of the funds. It is not disputed, however, that the direct financing by the Nakashes was essentially duplicative of the terms imposed by the Israel Discount Bank in an apparent arms-length transaction. We agree therefore with the Vice Chancellor that, on a comparative basis, the direct loans were favorable to Gasoline.

With respect to the use of the borrowings, the Marcianos contend that the Chancery Court's finding that the borrowed funds were expended for a proper corporate purpose was based upon inadmissible evidence to which a timely objection was made. The disputed evidence consisted of voluminous invoices and related shipping documents for purchases of finished goods, principally from foreign vendors. Gasoline's Controller, Michael Hayes, the only witness who testified at the evidentiary hearing, referred to such documents as "back-up," files which supported entries in the company's purchase journal. The Mar-

---

3. Although in this case none of the curative steps afforded under section 144(a) were available because of the director-shareholder deadlock, a non-disclosing director seeking to remove the cloud of interestedness would appear to have the same burden under section 144(a)(3), as under prior case law, of proving the intrinsic fairness of a questioned transaction which had been approved or ratified by the directors or shareholders. Folk, *The Delaware General Corp. Law: A Commentary and Analysis*, 86 (1972). On the other hand, approval by fully-informed disinterested directors under section 144(a)(1), or disinterested stockholders un-

der section 144(a)(2), permits invocation of the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction.

4. The Vice Chancellor rejected U.F. Factors' claim for a two percent warehousing fee on the ground that the Nakashes were unable to show, on a comparability basis, that the charge was fair to Gasoline. The Nakashes have not appealed that ruling.

cianos' argue that these documents were improperly admitted under the business records exception to the hearsay rule.[5]

█ Although the disputed invoices were in the possession of Gasoline's comptroller he conceded that he was not knowledgeable of events reflected in the documents. Superficially, this lack of knowledge would appear to bar admission under D.R.E. 803(6). However, if the invoices have become integrated into the company's records and are relied upon in day-to-day operations they are admissible as supporting or corroborative data on the limited question of whether the invoices were paid. *Black Sea & Baltic General v. S.S. Hellenic Destiny*, S.D.N.Y., 575 F.Supp. 685, 691 (1983); *In re King Enterprises*, 8th Cir., 678 F.2d 73, 78 (1982). If the dispute between the parties centered on the source of the shipments, as opposed to whether they were paid for, the absence of a knowledgeable person to verify the origination data might bar their admissibility. *See, N.L.R.B. v. First Termite Control Co., Inc.*, 9th Cir., 646 F.2d 424 (1981). In view of the limited purpose for which these documents were received in evidence, we find no error in their admissibility.

█ The Marcianos intimate that the admissibility of the back-up invoices foreclosed the question of whether Gasoline received full consideration for the goods reflected on the invoices. This suggestion is based on the claim that certain of the vendors were also entities controlled by the Nakashes. The disputed records were apparently available for examination by the Marcianos' accountants who had access to Gasoline's financial records prior to trial.

The Marcianos thus had full opportunity to demonstrate the falsity of the documents or collusion in the underlying transactions. At trial they chose to present no evidence with respect to the back-up files. Under the circumstances, it cannot be said that the admissibility of these documents foreclosed further proof concerning the accuracy of the documents and the claim of collusion.

## IV

Apart from the question of whether the corporation was disadvantaged by the terms of the loan transactions, the Marcianos contend, as a separate basis for disallowance of the loans, that the Nakashes were guilty of unfair dealing. The Marcianos' argument of unfair dealing is constructed upon the dual test of fairness for interested director transaction fashioned by this Court in *Weinberger*, 457 A.2d 701. Although the Vice Chancellor expressed doubt that the *Weinberger* standard is applicable to interested loan transactions, the Court concluded, that in any event, the unfair dealing claim would survive liquidation and be assertable in the ongoing derivative actions.

█ We agree with the Vice Chancellor that a *Weinberger* "fair dealing" analysis is not applicable in this case. This conclusion is based in part on the limited scope of a section 226 liquidation hearing and in part on the context in which this dispute arises. The purpose of the hearing was to test the validity of the challenged loans and was not, as the Marcianos suggest, a forum to try derivative claims based on allegations of unfair dealing. However, as

---

**5.** This exception to the hearsay rule is set forth in section 803(6) of the Delaware Rules of Evidence:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \* \* \* \* \* \*
>
> **(6) Records Of Regularly Conducted Activity.** A memorandum, report, record or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business

activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation and calling of every kind, whether or not conducted for profit.

\* \* \* \* \* \*

stated above, because of the interested nature of this transaction, *Weinberger's* concept of fairness is implicated. Moreover, the Nakashes' burden of proving fairness as well as good faith in relation to the financial considerations of the loan transaction is well settled. *Gottlieb v. Heyden,* Del.Supr., 90 A.2d 660, 663 (1952).

More to the point, if, as the Marcianos claim, the corporation has been harmed by the loan transactions crafted by the Nakashes, or that they realized a special benefit in the form of the one percent guarantee fee, a derivative claim to that effect offers a clear remedy. *Fliegler v. Lawrence,* Del.Supr., 361 A.2d 218 (1976). Indeed, if the claims are not asserted in the pending derivative litigation the Marcianos may be barred under principles of *res judicata* from bringing them in a separate action. *See Trans World Airlines, Inc. v. Hughes,* Del.Ch., 317 A.2d 114, 118 (1974). Further support for the continued viability of derivative claims arising out of the loan transactions is evidenced by the Court of Chancery order of April 14, 1987, which authorized the custodian, as nominal defendant, to exercise his discretion in permitting the continued prosecution of the derivative claims asserted on behalf of Gasoline by the Marcianos.

Finally, there is no suggestion that permitting the Nakashes to realize a partial return of the loan principal will render them less likely to respond to a derivative claim and any judgment subsequently realized.

We hold, therefore, that the Court of Chancery properly applied the intrinsic fairness test in determining the validity of the interested director transactions and its finding of full fairness is clearly supported by the record. Accordingly, the decision is AFFIRMED.