**BENIHANA OF TOKYO, INC.,** individually and on behalf of Benihana, Inc., Plaintiff Below–Appellant,

v.

**BENIHANA, INC.,** John E. Abdo, Norman Becker, Darwin Dornbush, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges, Takanori Yoshimoto, and BFC Financial Corporation, Defendants Below–Appellees.

No. 36, 2006.

Supreme Court of Delaware.

Submitted: June 14, 2006.
Decided: Aug. 24, 2006.

C. Barr Flinn, Elena C. Norman and D. Fon Muttamara–Walker of Young Conaway Stargatt & Taylor, L.L.P., Wilmington, DE; Jonathan Rosenberg (argued) and Alexandra A. Lewis of O'Melveny & Myers, L.L.P., New York City, of counsel, for appellant.

Gregory V. Varallo (argued), Lisa Zwally Brown and Geoffrey G. Grivner of Richards, Layton & Finger, P.A., Wilmington,

DE; Jeffrey A. Tew, and Dennis Nowak of Tew Cardenas, L.L.P., Miami, FL, of counsel, for appellees Benihana, Inc., Norman Becker, Darwin Dornbush, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges and Takamori Yoshimoto.

John G. Harris of Reed Smith, L.L.P., Wilmington, DE; Alan H. Fein (argued) of Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., Miami, FL, of counsel, for appellees BFC Financial Corporation and John E. Abdo.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

BERGER, Justice:

In this appeal, we consider whether Benihana, Inc. was authorized to issue $20 million in preferred stock and whether Benihana's board of directors acted properly in approving the transaction. We conclude that the Court of Chancery's factual findings are supported by the record and that it correctly applied settled law in holding that the stock issuance was lawful and that the directors did not breach their fiduciary duties. Accordingly, we affirm.

Factual and Procedural Background

Rocky Aoki founded Benihana of Tokyo, Inc. (BOT), and its subsidiary, Benihana, which own and operate Benihana restaurants in the United States and other countries. Aoki owned 100% of BOT until 1998, when he pled guilty to insider trading charges. In order to avoid licensing problems created by his status as a convicted felon, Aoki transferred his stock to the Benihana Protective Trust. The trustees of the Trust were Aoki's three children (Kana Aoki Nootenboom, Kyle Aoki and Kevin Aoki) and Darwin Dornbush (who was then the family's attorney, a Benihana director, and, effectively, the company's general counsel).

Benihana, a Delaware corporation, has two classes of common stock. There are approximately 6 million shares of Class A common stock outstanding. Each share has 1/10 vote and the holders of Class A common are entitled to elect 25% of the directors. There are approximately 3 million shares of Common stock outstanding. Each share of Common has one vote and the holders of Common stock are entitled to elect the remaining 75% of Benihana's directors. Before the transaction at issue, BOT owned 50.9% of the Common stock and 2% of the Class A stock. The nine member board of directors is classified and the directors serve three-year terms.[1]

In 2003, shortly after Aoki married Keiko Aoki, conflicts arose between Aoki and his children. In August, the children were upset to learn that Aoki had changed his will to give Keiko control over BOT. Joel Schwartz, Benihana's president and chief executive officer, also was concerned about this change in control. He discussed the situation with Dornbush, and they briefly considered various options, including the issuance of sufficient Class A stock to trigger a provision in the certificate of incorporation that would allow the Common and Class A to vote together for 75% of the directors.[2]

1. The directors at the time of the challenged transaction were: Dornbush, John E. Abdo, Norman Becker, Max Pine, Yoshihiro Sano, Joel Schwartz, Robert B. Sturges, Takanori Yoshimoto, and Kevin Aoki.

2. Before this time, Schwartz and Dornbush had discussed transactions that could lead to BOT's loss of its voting control. Schwartz testified that, under pressure from Wall Street, he was looking at ways to improve Benihana's stock liquidity, and the elimination of the two-tiered voting structure would have helped. As part of his effort to improve liquidity, Schwartz regularly asked Dornbush whether the Trust was interested in selling the shares held by BOT.

The Aoki family's turmoil came at a time when Benihana also was facing challenges. Many of its restaurants were old and outmoded. Benihana hired WD Partners to evaluate its facilities and to plan and design appropriate renovations. The resulting Construction and Renovation Plan anticipated that the project would take at least five years and cost $56 million or more. Wachovia offered to provide Benihana a $60 million line of credit for the Construction and Renovation Plan, but the restrictions Wachovia imposed made it unlikely that Benihana would be able to borrow the full amount.[3] Because the Wachovia line of credit did not assure that Benihana would have the capital it needed, the company retained Morgan Joseph & Co. to develop other financing options.

On January 9, 2004, after evaluating Benihana's financial situation and needs, Fred Joseph, of Morgan Joseph, met with Schwartz, Dornbush and John E. Abdo, the board's executive committee. Joseph expressed concern that Benihana would not have sufficient available capital to complete the Construction and Renovation Plan and pursue appropriate acquisitions. Benihana was conservatively leveraged, and Joseph discussed various financing alternatives, including bank debt, high yield debt, convertible debt or preferred stock, equity and sale/leaseback options.

The full board met with Joseph on January 29, 2004. He reviewed all the financing alternatives that he had discussed with the executive committee, and recommended that Benihana issue convertible preferred stock.[4] Joseph explained that the preferred stock would provide the

funds needed for the Construction and Renovation Plan and also put the company in a better negotiating position if it sought additional financing from Wachovia.

Joseph gave the directors a board book, marked "Confidential," containing an analysis of the proposed stock issuance (the Transaction). The book included, among others, the following anticipated terms: (i) issuance of $20,000,000 of preferred stock, convertible into Common stock; (ii) dividend of 6% +/− 0.5%; (iii) conversion premium of 20% +/− 2.5%; (iv) buyer's approval required for material corporate transactions; and (v) one to two board seats to the buyer. At trial, Joseph testified that the terms had been chosen by looking at comparable stock issuances and analyzing the Morgan Joseph proposal under a theoretical model.

The board met again on February 17, 2004, to review the terms of the Transaction. The directors discussed Benihana's preferences and Joseph predicted what a buyer likely would expect or require. For example, Schwartz asked Joseph to try to negotiate a minimum on the dollar value for transactions that would be deemed "material corporation transactions" and subject to the buyer's approval. Schwartz wanted to give the buyer only one board seat, but Joseph said that Benihana might have to give up two. Joseph told the board that he was not sure that a buyer would agree to an issuance in two tranches, and that it would be difficult to make the second tranche non-mandatory. As the Court of Chancery found, the board understood that the preferred terms were akin to a "wish list."

---

3. Benihana would only be able to borrow 1.5 times its earnings before interest, taxes, depreciation and amortization (EBITDA). In 2003, Benihana's EBITDA was far below the $40 million required to access the full credit limit.

4. Joseph testified that: "the oldest rule in our business is you raise equity when you can, not when you need it. And Benihana's stock had been doing okay. The markets were okay. We thought we could do an equity placement."

Shortly after the February meeting, Abdo contacted Joseph and told him that BFC Financial Corporation was interested in buying the new convertible stock.[5] In April 2005, Joseph sent BFC a private placement memorandum. Abdo negotiated with Joseph for several weeks.[6] They agreed to the Transaction on the following basic terms: (i) $20 million issuance in two tranches of $10 million each, with the second tranche to be issued one to three years after the first; (ii) BFC obtained one seat on the board, and one additional seat if Benihana failed to pay dividends for two consecutive quarters; (iii) BFC obtained preemptive rights on any new voting securities; (iv) 5% dividend; (v) 15% conversion premium; (vi) BFC had the right to force Benihana to redeem the preferred stock in full after ten years; and (vii) the stock would have immediate "as if converted" voting rights. Joseph testified that he was satisfied with the negotiations, as he had obtained what he wanted with respect to the most important points.

On April 22, 2004, Abdo sent a memorandum to Dornbush, Schwartz and Joseph, listing the agreed terms of the Transaction. He did not send the memorandum to any other members of the Benihana board. Schwartz did tell Becker, Sturges, Sano, and possibly Pine that BFC was the potential buyer. At its next meeting, held on May 6, 2004, the entire board was officially informed of BFC's involvement in the Transaction. Abdo made a presentation on behalf of BFC and then left the meeting. Joseph distributed an updated board book, which explained that Abdo had approached Morgan Joseph on behalf of BFC, and included the negotiated terms. The trial court found that the

board was not informed that Abdo had negotiated the deal on behalf of BFC. But the board did know that Abdo was a principal of BFC. After discussion, the board reviewed and approved the Transaction, subject to the receipt of a fairness opinion.

On May 18, 2004, after he learned that Morgan Joseph was providing a fairness opinion, Schwartz publicly announced the stock issuance. Two days later, Aoki's counsel sent a letter asking the board to abandon the Transaction and pursue other, more favorable, financing alternatives. The letter expressed concern about the directors' conflicts, the dilutive effect of the stock issuance, and its "questionable legality." Schwartz gave copies of the letter to the directors at the May 20 board meeting, and Dornbush advised that he did not believe that Aoki's concerns had merit. Joseph and another Morgan Joseph representative then joined the meeting by telephone and opined that the Transaction was fair from a financial point of view. The board then approved the Transaction.

During the following two weeks, Benihana received three alternative financing proposals. Schwartz asked Becker, Pine and Sturges to act as an independent committee and review the first offer. The committee decided that the offer was inferior and not worth pursuing. Morgan Joseph agreed with that assessment. Schwartz referred the next two proposals to Morgan Joseph, with the same result.

On June 8, 2004, Benihana and BFC executed the Stock Purchase Agreement. On June 11, 2004, the board met and approved resolutions ratifying the execution of the Stock Purchase Agreement and authorizing the stock issuance. Schwartz

---

5. BFC, a publicly traded Florida corporation, is a holding company for several investments. Abdo is a director and vice chairman. He owns 30% of BFC's stock.

6. At the outset of the negotiations, Joseph agreed not to shop the Transaction to any other potential investor for a limited period of time.

then reported on the three alternative proposals that had been rejected by the ad hoc committee and Morgan Joseph. On July 2, 2004, BOT filed this action against all of Benihana's directors, except Kevin Aoki, alleging breaches of fiduciary duties; and against BFC, alleging that it aided and abetted the fiduciary violations. Three months later, as the parties were filing their pre-trial briefs, the board again reviewed the Transaction. After considering the allegations in the amended complaint, the board voted once more to approve it. The Court of Chancery held a four day trial in November 2004. In December 2005, after post-trial briefing and argument, the trial court issued an opinion holding that Benihana was authorized to issue the preferred stock with preemptive rights, and that the board's approval of the Transaction was a valid exercise of business judgement. This appeal followed.

### Discussion

Before addressing the directors' conduct and motivation, we must decide whether Benihana's certificate of incorporation authorized the board to issue preferred stock with preemptive rights. Article 4, ¶ 2 of the certificate provides that, "[n]o stockholder shall have any preemptive right to subscribe to or purchase any issue of stock . . . of the corporation. . . ." Article 4(b) authorizes the board to issue:

Preferred Stock of any series and to state in the resolution or resolutions providing for the issuance of shares of any series the voting powers, if any, designations, preferences and relative, participating, optional or other special rights, and the qualifications, limitations or restrictions of such series to the full extent now or hereafter permitted by the law of the State of Delaware. . . .

BOT contends that Article 4, ¶ 2 clearly and unambiguously prohibits preemptive rights. BOT acknowledges that Article 4(b) gives the board so-called "blank check" authority to designate the rights and preferences of Benihana's preferred stock. Reading the two provisions together, BOT argues that they give the board blank check authority to designate rights and preferences as to all enumerated matters *except* preemptive rights.

The trial court reviewed the history of 8 *Del. C.* § 102, and decided that the boilerplate language in Article 4, ¶ 2 merely confirms that no stockholder has preemptive rights under common law. As a result, the seemingly absolute language in ¶ 2 has no bearing on the availability of contractually created preemptive rights. The trial court explained:

Before the 1967 amendments, § 102(b)(3) provided that a certificate of incorporation may contain provisions "limiting or denying to the stockholders the preemptive rights to subscribe to any or all additional issues of stock of the corporation." As a result, a common law rule developed that shareholders possess preemptive rights unless the certificate of incorporation provided otherwise. In 1967 the Delaware Legislature reversed this presumption. Section 102(b)(3) was amended to provide in relevant part: "No stockholder shall have any preemptive right . . . unless, and except to the extent that, such right is expressly granted to him in the certificate of incorporation."

Thereafter, companies began including boilerplate language in their charters to clarify that no shareholder possessed preemptive rights under common law.

The blank check provision in Benihana's Certificate of Incorporation suggests that the certificate was never intended to limit Benihana's ability to issue preemptive rights by contract to purchasers of preferred stock. There-

fore, I do not read Article 4 of the charter as doing anything more than confirming that the common law presumption does not apply and that the Certificate of Incorporation itself does not grant any preemptive rights.[7]

■ It is settled law that certificates of incorporation are contracts, subject to the general rules of contract and statutory construction.[8] Thus, if the charter language is clear and unambiguous, it must be given its plain meaning.[9] If there is ambiguity, however, the language must be construed in a manner that will harmonize the apparent conflicts and give effect to the intent of the drafters.[10] The Court of Chancery properly applied these principles, and we agree with its conclusion that the Benihana certificate does not prohibit the issuance of preferred stock with preemptive rights.

Even if the Benihana board had the power to issue the disputed stock, BOT maintains that the trial court erred in finding that it acted properly in approving the Transaction. Specifically, BOT argues that the Court of Chancery erred: (1) by applying 8 *Del. C.* § 144(a)(1), because the board did not know all material facts before it approved the Transaction; (2) by applying the business judgment rule, because Abdo breached his fiduciary duties; and (3) by finding that the board's primary purpose in approving the Transaction was not to dilute BOT's voting power.

## A. Section 144(a)(1) Approval

■ Section 144 of the Delaware General Corporation Law provides a safe harbor for interested transactions, like this one, if "[t]he material facts as to the director's ... relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors ... and the board ... in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors...."[11] After approval by disinterested directors, courts review the interested transaction under the business judgment rule,[12] which "is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company."[13]

■ BOT argues that § 144(a)(1) is inapplicable because, when they approved the Transaction, the disinterested directors did not know that Abdo had negotiated the terms for BFC.[14] Abdo's role as negotiator is material, according to BOT, because Abdo had been given the confidential term sheet prepared by Joseph and knew which of those terms Benihana was prepared to give up during negotiations. We agree that the board needed to know about Abdo's involvement in order to make an informed decision. The record clearly

---

7. *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 172 (Del.Ch.2005) (Citation omitted).

8. *Staar Surgical Co. v. Waggoner,* 588 A.2d 1130, 1136 (Del.1991); *Lawson v. Household Finance Corporation,* 152 A. 723, 726 (Del. 1930).

9. *Northwestern National Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43 (Del.1996).

10. *Anchor Motor Freight v. Ciabattoni,* 716 A.2d 154 (Del.1998).

11. 8 Del. C. § 144(a)(1).

12. *See Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 366 n. 34 (Del.1993); *Marciano v. Nakash,* 535 A.2d 400, 405 n. 3 (Del.1987).

13. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984).

14. BOT argued to the trial court that the directors who voted on the Transaction were not disinterested or independent. BOT is not pressing that claim on appeal.

establishes, however, that the board possessed that material information when it approved the Transaction on May 6, 2004 and May 20, 2004.

Shortly before the May 6 meeting, Schwartz told Becker, Sturges and Sano that BFC was the proposed buyer. Then, at the meeting, Abdo made the presentation on behalf of BFC. Joseph's board book also explained that Abdo had made the initial contact that precipitated the negotiations. The board members knew that Abdo is a director, vice-chairman, and one of two people who control BFC. Thus, although no one ever said, "Abdo negotiated this deal for BFC," the directors understood that he was BFC's representative in the Transaction. As Pine testified, "whoever actually did the negotiating, [Abdo] as a principal would have to agree to it. So whether he sat in the room and negotiated it or he sat somewhere else and was brought the results of someone else's negotiation, he was the ultimate decisionmaker." [15] Accordingly, we conclude that the disinterested directors possessed all the material information on Abdo's interest in the Transaction, and their approval at the May 6 and May 20 board meetings satisfies § 144(a)(1).[16]

## B. Abdo's alleged fiduciary violation

■ BOT next argues that the Court of Chancery should have reviewed the Transaction under an entire fairness standard because Abdo breached his duty of loyalty when he used Benihana's confidential information to negotiate on behalf of BFC. This argument starts with a flawed premise. The record does not support BOT's contention that Abdo used any confidential information against Benihana. Even without Joseph's comments at the February 17 board meeting, Abdo knew the terms a buyer could expect to obtain in a deal like this. Moreover, as the trial court found, "the negotiations involved give and take on a number of points" and Benihana "ended up where [it] wanted to be" for the most important terms.[17] Abdo did not set the terms of the deal; he did not deceive the board; and he did not dominate or control the other directors' approval of the Transaction. In short, the record does not support the claim that Abdo breached his duty of loyalty.[18]

## C. Dilution of BOT's voting power

Finally, BOT argues that the board's primary purpose in approving the Transaction was to dilute BOT's voting control. BOT points out that Schwartz was concerned about BOT's control in 2003 and even discussed with Dornbush the possibility of issuing a huge number of Class A shares. Then, despite the availability of other financing options, the board decided on a stock issuance, and agreed to give BFC "as if converted" voting rights. According to BOT, the trial court overlooked this powerful evidence of the board's improper purpose.

■ It is settled law that, "corporate action . . . may not be taken for the sole or

---

**15.** Appellant's Appendix, A 135.

**16.** The Court of Chancery also decided that the Benihana directors' ratifying votes on June 11 and October 27, 2004 provide independent grounds to uphold their decision under § 144. 891 A.2d at 181 n. 190. Assuming that the board's initial decision was not an informed one, we question how a vote taken after the June 8 closing could ratify the earlier approval. *See: Smith v. Van Gorkom,* 488 A.2d 858, 885–888 (Del.1985). We need

not reach this question, however, as we find that the board was adequately informed of all material facts before voting at the May 6 and May 20 meetings.

**17.** *Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d at 181 (Internal quotations omitted.).

**18.** *Cf. Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1170 (Del.1995).

primary purpose of entrenchment."[19] Here, however, the trial court found that "the primary purpose of the ... Transaction was to provide what the directors subjectively believed to be the best financing vehicle available for securing the necessary funds to pursue the agreed upon Construction and Renovation Plan for the Benihana restaurants."[20] That factual determination has ample record support, especially in light of the trial court's credibility determinations. Accordingly, we defer to the Court of Chancery's conclusion that the board's approval of the Transaction was a valid exercise of its business judgment, for a proper corporate purpose.

Conclusion

Based on the foregoing, the judgment of the Court of Chancery is affirmed.

---

**19.** *Williams v. Geier*, 671 A.2d 1368, 1381 n. 28 (Del.1996).

**20.** 891 A.2d at 190.