[948 NYS2d 597]

In the Matter of the Estate of ROCKY H. AOKI, Also Known as HIROAKI AOKI, Deceased. KEIKO ONO AOKI, Respondent; KANA AOKI NOOTENBOOM et al., Appellants, et al., Objectant, et al., Respondents.

First Department, July 17, 2012

APPEARANCES OF COUNSEL

*Holland & Knight LLP*, New York City (*Brian P. Corrigan, Joseph P. Sullivan, Faith L. Carter* and *Charles F. Gibbs* of counsel), for appellants.

*Rosenberg Feldman Smith, LLP*, New York City (*Richard B. Feldman, Michael H. Smith* and *McKenzie A. Livingston* of counsel), for Keiko Ono Aoki, respondent.

## OPINION OF THE COURT

TOM, J.P.

Children of the late restauranteur Rocky Aoki contest those provisions of his will bequeathing to his wife, petitioner Keiko Ono Aoki, all of decedent's global interest in the Benihana restaurants and franchises held by his wholly-owned corporation, Benihana of Tokyo, Inc. (BOT), a major owner of the shares of the publicly-traded Benihana, Inc. Chiefly, Kana, Kevin, Echo and Kyle Aoki (objectants) contend that the will should not have been summarily admitted to probate because issues of fact exist with respect to both the testator's mental capacity and their stepmother's exertion of undue influence. Kana, Kevin and Kyle, in their capacity as trustees of the Benihana Protective Trust, which was created to hold decedent's interest in BOT, and their fellow trustee Kenneth Podziba, assert that they were improperly required to turn over the assets of the trust to Keiko. This Court concludes that the record contains no evidence that Rocky was cognitively impaired at any time remotely contemporaneous with the signing of the instrument and that his disposition of the property was an exercise of free will. Thus, we affirm the orders of the Surrogate in all respects.

In 1959, decedent Rocky Aoki, founder of the Benihana restaurant chain, came to the United States from Japan with the Japanese wrestling team. He enrolled in the School of Restaurant Management at New York City Technical College in Manhattan. He made a living by washing dishes, driving an ice cream truck, and working as a tour guide. In 1963, Rocky took his savings of $10,000, borrowed $20,000 more, and opened the first Benihana restaurant on West 56th Street in Manhattan, which proved to be successful, and the rest is history.

Prior to June 1998, Rocky's wholly-owned company, BOT, owned 50.9% of the public restaurant company Benihana, Inc., which owns an extensive chain of Japanese restaurants and franchises throughout the United States, the Honolulu Beni-

hana restaurant, and joint interests in Benihana restaurants in foreign countries. Until mid-1998, Rocky was the chief executive officer (CEO) of BOT and the chairman of the board of Benihana, Inc.

In 1998, Rocky was convicted of insider trading, a felony, which prompted the formation of the Benihana Protective Trust. State statutes prohibit felons from owning any entity with a liquor license or from serving as an officer, director or manager of a restaurant that holds a liquor license. As a result, Rocky was obligated to resign as CEO and director of BOT, and as director and chairman of Benihana, Inc. and to transfer his interest in BOT (which then held 50.9% of the stock in Benihana, Inc.) to the trust. The value of the stock Rocky owned in Benihana, Inc. through BOT and the trust was stated in 2006 to be over $50 million. Rocky appointed three of his children to serve as trustees (objectants Kana, Kyle, and Kevin), together with his attorney and longtime friend, Darwin C. Dornbush, Esq. To remain involved with the business, Rocky entered into a consulting agreement with Benihana, Inc.

In addition to Kana, Kyle, and Kevin, Rocky's offspring included Steven, Devon, and Echo, whom he acknowledged, and a nonmarital child, objectant Jennifer Lynn Crumb. Rocky's children Kana, Kevin and Steven are from his first marriage to Chizuru Kobayashi, which ended in divorce in 1981. Kyle, Echo and Devon are from his second marriage to Pamela Jane Hillberger, which also ended in divorce in 1991. Until his death, Rocky and his six marital children were the income beneficiaries of the trust, receiving an annual income at the sole discretion of the nonfamily trustee, attorney Dornbush, who continued to serve in his long-standing role as Rocky's counsel. In that capacity, Dornbush (or his firm) drafted a 1998 will leaving Rocky's entire estate to his six marital children. There's a saying that "many men can make a fortune but very few can build a family." Thus, while Rocky's restaurant empire was flourishing, his problems within his family were beginning to mount and subsequently spiraled into an irreconcilable feud pitting Rocky and Keiko against Rocky's children from his two prior marriages in a contentious struggle for control of the Benihana empire.

Keiko, a successful businessperson with her own company (Altesse Co., Ltd.), began to date Rocky in 2001, arousing considerable apprehension among his children. In July 2002, the couple were secretly married. Keiko was Rocky's third wife.

Rocky informed a close friend, Ken Podziba, of his intention to seek a postnuptial agreement and purportedly instructed Kevin and Kana to obtain one from Keiko, but she refused to comply. Dornbush recalled that in approximately September 2002, Rocky met with Kevin and Kana to discuss, among other things, whether to plan his estate to pass the corpus of the trust to his six marital children. That same month, Rocky was presented with an action plan, drafted by Dornbush's partner, Norman Shaw, Esq. Rocky agreed to the plan and Shaw prepared an instrument—an irrevocable partial release of his power to designate the beneficiaries of the trust corpus upon his death, which limited the beneficiaries to his marital descendants. On or about September 24, 2002, Rocky signed his first partial release.

In 1998, Rocky made a will that left his entire estate to his six marital children. The will was drafted by Dornbush, or Dornbush's firm. A second partial release of his power of appointment over the trust was executed in December 2002 which, while maintaining the essential terms of the first partial release, was more tax efficient. It further limited Rocky's power to designate the beneficiaries of the principal and income to those of his descendants who were lawful residents. Rocky did not inform Keiko that he had signed the second partial release.

In January 1999, Rocky executed a codicil to his 1998 will. Since the amended 1998 will did not exercise Rocky's power of appointment under the trust, its disposition left the division of the corpus in equal shares among his six marital children.

However, Rocky exercised his testamentary power of appointment under the trust agreement in a codicil dated August 4, 2003, which left Keiko 25% of the corpus in fee simple with the remainder to be held in trust and passed on to any of his offspring whom Keiko (in her discretion) might designate. Keiko maintained a life estate in the remainder, to be passed to Rocky's children. The codicil was drafted by Keiko's regular counsel, Joseph Manson of Piper Rudnick in Washington, D.C., and the firm was recommended by her. Asked by Manson to review the August 2003 codicil, Dornbush drafted a legal opinion letter stating that it was invalid in light of the irrevocable partial releases Rocky had executed. It was at this time that Rocky, while acknowledging his awareness that the releases left the Benihana stock to his children, asserted he had no knowledge that the releases were "irrevocable." To this end, Rocky executed an affidavit dated September 22, 2003 and appeared in a videotaped recording, in which he stated that he had never

intended to irrevocably limit his power of appointment over the trust corpus and disavowed knowledge that the releases contained such language. While the validity of the releases remains unresolved, the controversy only exacerbated the rift between Rocky and his children.

Meanwhile, Keiko increased her involvement in Rocky's business affairs by providing consulting services through Altesse, prompting the move of BOT's offices, located in Miami for the past 20 years, to Keiko's New York City apartment. In response to her growing influence, Kevin is alleged to have informed management at Benihana, Inc. that, upon Rocky's death, Keiko would assume control of the company and current management would be terminated. Rocky blamed Kevin for initiating a series of transactions involving the issuance of additional shares, diluting BOT's controlling interest in the corporation from 50.9% to 36.5%. A July 2004 suit, brought at Rocky's insistence, challenging BOT's loss of control of the corporation's affairs was unsuccessful in rescinding the transactions (*see Benihana of Tokyo, Inc. v Benihana, Inc.*, 891 A2d 150 [Del 2005], *affd* 906 A2d 114 [Del 2006]). In a May 2005 letter to Kana, Rocky expressed his disappointment in Kevin, stating that his children, in their capacity as trustees, were acting out of self-interest and against his interests and those of the trust and the business he had "struggled hard for 41 years to create." He explained that he would leave it to Keiko to decide which of his children would receive the other 75% of trust assets after his death, while adding that he would be "happy" to leave "seven equal shares to my wife and six kids after I die if everyone can get along." Kana responded by blaming Keiko for poisoning Rocky against his children and proposed that Rocky meet with his children alone. Following a July 2005 meeting, Rocky wrote to Kana reaffirming his confidence in Keiko to distribute the trust assets upon his death.

In February of the next year, Kevin, Kana and Kyle, as trustees, sold 100,000 shares of BOT's Benihana, Inc. stock, further diminishing the Aoki family holdings. Upon learning of the sale in early March 2006, Rocky asked the trustees to resign based on asserted conflicts of interest. That same month, Rocky executed a fourth codicil to his 1998 will, effectively disinheriting Kevin, Kana, Echo and Kyle. Also that month, the trustees amended the trust instrument to provide them with compensation for their services.

In the fall, Rocky advised his children in a letter that should the family fail to reach mutual terms by November 1, 2006, he

would commence an action to remove those children serving as trustees or as officers of BOT and "never" change his will. In late November, as settlor and beneficiary of the trust, Rocky commenced an action in New York State Supreme Court against his children and others, alleging breach of the defendants' fiduciary duties as trustees and as officers and directors. Manson, now with Baker Hostetler, signed the complaint. Objectants were represented by Holland & Knight.

In February 2007, Rocky was diagnosed with liver cancer. In an attempt to resolve his disputes with his children, Rocky requested his friend Hirohoto Kato to intervene on his behalf.[1] An August 2007 meeting was heated and unsuccessful, resulting in a letter in which Rocky chided his children for failing to understand or trust him, and for destroying his "baby," Benihana.

Through letters between Keiko and Manson, Rocky continued to explore changing his will because, among other things, Devon and Steven declined to settle their differences with him. Manson, who had drafted the two prior codicils, responded that his firm was suspending all work on Rocky's suit as a result of nonpayment of its fees, which had been billed to Altesse. Keiko then referred Rocky to the attorney who had drafted her will and he, in turn, recommended Paul Karan, Esq. of Todtman, Nachamie, Spizz & Johns, P.C. Objectants note that office records maintained by Manson and Karan indicated that Keiko had participated in some 42 meetings between said counsel and Rocky from September 2003 through February 2007.

On September 7, 2007, Rocky executed a will drafted by Karan and witnessed by him and three other attorneys in the firm. Keiko was named as executor, and all of Rocky's real and personal property, including property jointly owned with Keiko, was bequeathed to her. The will exercised Rocky's power of appointment under the trust agreement so that the entire trust principal and accumulated income trust would be distributed 25% outright to Keiko with the 75% remainder to the "Keiko Aoki Trust." As the sole trustee of that entity, Keiko was to pay the net income to herself, as surviving spouse, with the trust principal to be distributed, in her discretion, among Rocky's issue, either outright or in trust. In the event Keiko failed to survive Rocky or failed to exercise her power to appoint the

---

1. Kato, who was working for Altesse at the time Rocky met him in 2000, had been president of BOT since 2003.

beneficiaries of the Keiko Aoki Trust, the will provided for distribution of the balance of the "Benihana Protective Trust or such unappointed portion of the Keiko Aoki Trust, as the case may be, to my then surviving issue, *per stirpes.*" In the event that the trust agreement was invalidated due to the restrictions contained in the 2002 partial releases that Rocky disavowed, the will also exercised an alternative power of appointment, effectively dividing the 75% remainder equally between Devon and Steven. An in terrorem clause treated any marital child challenging the will as having predeceased Rocky.

Following Rocky's death on July 10, 2008 at the age of 69, Keiko commenced this proceeding by filing a probate petition. His six children received approximately $1.2 million each from a separate life insurance trust. Among other matters, a petition to determine the validity of the partial releases was brought by Kana, Kevin, and Kyle Aoki, together with Kenneth Podziba (who had replaced Dornbush as a trustee). These petitioners also brought a proceeding for judicial settlement of their account as trustees of the Benihana Protective Trust. Meanwhile, Keiko petitioned for civil contempt against Podziba over an undisclosed distribution of shares of Benihana, Inc. All three cases were transferred to Surrogate's Court.

In April 2009, Keiko moved by order to show cause for an order directing the cotrustees to turn over the trust assets to her as fiduciary of Rocky's estate, arguing that upon Rocky's death, the trust instrument provided for its termination and distribution of the assets in accordance with the 2007 will. The trustees moved to dismiss the petition, contending that Keiko lacked standing due to the pendency of proceedings contesting the validity of the will and, inter alia, the 2002 releases. In a preliminary order, the Surrogate held the turnover petition in abeyance pending resolution of the probate proceedings and continued a temporary order restraining distribution of trust assets other than payment of ordinary expenses.

Keiko moved for summary judgment dismissing the objections and admitting the will to probate. She maintained that the will and codicils, Rocky's testimony, and that of his attorneys provided ample evidence of his testamentary wishes. She noted that, at the outset, objectants had been unalterably opposed to her marriage to Rocky for fear of losing their inheritance and responded by attempting measures harmful to Rocky's interests, including: (1) excluding Rocky and her from control over the Benihana empire, (2) causing the Aoki family to lose control

over Benihana, Inc., and (3) depriving Rocky of distributions from the trust (resulting in his 2006 lawsuit against his children for breach of their fiduciary duties). Keiko asserted that the evidence demonstrated that Rocky had repeatedly attempted, by using his will and previous codicils as incentives, to make peace between his children and Keiko. She asserted that she was never present during discussions with counsel regarding Rocky's testamentary wishes and had only advised Rocky to protect his business interests in the Benihana empire; thus her joint meetings with Manson and Rocky allegedly concerned business matters, not testamentary matters. Keiko averred that the self-interest demonstrated by objectants, including their willingness to enrich themselves at the expense of the Aoki name and the family's control of the Benihana empire, ultimately led Rocky to place his faith in her to preserve and maintain his legacy.

In opposition, objectants argued that factual issues precluded summary determination, particularly as to Rocky's testamentary capacity and Keiko's undue influence over him, noting that the disposition of his estate to his six marital children had been eliminated shortly after his marriage to Keiko. They claimed that Keiko had engineered an outright devise of the estate to herself, in addition to 25% of the trust assets and a life estate in the remainder. They contended that the evidence raises factual issues as to whether Keiko exercised her strong will over an increasingly sick and weakened Rocky to alienate him from his children, disinherit them and otherwise deprive them of the fortune Rocky had intended to leave them.

Objectants submitted nine affidavits from friends and family members attesting to Keiko's dominance over Rocky, including observations that since their 2002 marriage, he had become more isolated and had been the recipient of verbal abuse from his wife. Also submitted was a November 1999 presentence report prepared in connection with Rocky's felony conviction, which states that

> "as a result of Interferon therapy [as treatment of his hepatitis C condition and corresponding immunological deficits Rocky] has had a progressive loss of cognition. A Magnetic Resonance Imaging (MRI) scan of the brain revealed atrophy involving the posterior fossa and the[ ] supratentorial portions of the brain as well as the cerebellar folia. According to neurological and cognitive evaluations,

this neurological degeneration has markedly reduced [Rocky's] ability to understand information, and impairs his memory and judgment."

In a July 27, 2001 letter addressed to the probation department, Rocky's treating physician stated that while he lacked the "expertise" necessary to evaluate Rocky's competence to stand trial, a "side effect of the interferon," administered in weekly injections to treat chronic hepatitis C, "is impaired concentration leading to lapses in memory," inhibiting his ability "to learn quickly new information."

The first order appealed from granted Keiko's motion to direct the trustees to turn over the trust assets to her as estate fiduciary. However, the Surrogate specifically noted that there could be no distribution of trust assets until the validity of the 2002 releases was decided at trial.

The second order appealed from granted Keiko's motion for summary judgment, dismissing the objections of Kana, Kevin, Echo and Kyle Aoki and Jennifer Crumb. By decree entered September 1, 2010, the Surrogate ordered that the will offered by Keiko be admitted to probate, and that letters testamentary and letters of trusteeship be issued to the executor and trustee.

The Surrogate observed that objectants had failed to raise a challenge to the due execution of the will, and Keiko had met her initial burden on that issue. Notably, the three attesting witnesses were attorneys, and a "self-proving affidavit" was included, giving rise to a presumption of compliance (citing *Matter of Korn*, 25 AD3d 379 [2006]). The Surrogate noted that objectants' challenge to testamentary capacity was based on their contention that Rocky was too weak and ill to withstand Keiko's strong will and influence. The court found that Keiko, as proponent of the 2007 will, had met her initial burden to demonstrate that Rocky possessed the requisite legal capacity to execute the will. In particular, the attestation clause of the 2007 will constituted prima facie evidence of Rocky's sound mind, memory and understanding at the time of execution (citing *Matter of Clapper*, 279 AD2d 730, 731 [2001]). The burden having shifted to objectants, their evidence of mental capacity was "too distant in time," dating back to 1999 and 2001 when Rocky was facing criminal charges and receiving interferon for hepatitis C and immunological deficiencies. The Surrogate noted the lack of recent medical evidence from either a treating physician or one who had examined Rocky recently to provide evidence probative of Rocky's mental health in 2007. The record

indicated that Rocky ceased the use of interferon prior to 2002, and other evidence—including videos, Rocky's 2007 in-depth deposition testimony concerning his restaurant business, and his letters—demonstrated that he was cognitively aware and of sound mind and was regarded as such. The court further found that three medical affidavits submitted by Rocky's nonmarital child, objectant Jennifer Crumb, were inadmissible because they were not disclosed in response to a demand for expert witnesses under CPLR 3101 (d) and submitted in opposition to a summary judgment motion (*see Salzo v Bedding Showcase*, 238 AD2d 180 [1997], *lv denied* 90 NY2d 806 [1997]). The court further found Jennifer's medical affidavits to be premised solely on speculative assumptions, inasmuch as her expert physicians had relied on outdated medical records and did not personally examine Rocky.

As to undue influence, the court found that "abundant" evidence—including legal agreements, Rocky's letters, deposition testimony and videos, together with statements by persons who would not gain under the will—supplied the requisite "contrary inference" to objectants' evidence that Keiko allegedly orchestrated a transfer of the assets in Rocky's estate to herself. The Surrogate noted Rocky's expressed "overwhelming desire to preserve the Aoki legacy through control of the Benihana empire," and his belief that, in light of his children's behavior, Keiko was best suited to ensure that his testamentary wishes were respected. The Surrogate also noted that the heavy tax consequences of a division of Rocky's assets among the children upon his death would have virtually ensured liquidation of the Aoki holdings in Benihana to meet the tax burden. The Surrogate found that the "friend" affidavits submitted by objectants to demonstrate undue influence, when "[r]ead collectively," were "filled with hearsay, speculation and surmise." The court noted that many of the individuals who supplied affidavits lived in areas affording only limited opportunity for observing Rocky following his marriage to Keiko. Further, the court found that even assuming the truth of the affidavits, undue influence would not be established since there was no evidence that Keiko forced Rocky to execute the 2007 will against his wishes. Also found unavailing was objectants' argument that the liaison between Rocky and Keiko was more akin to a confidential relationship than a marital one such that an inference of undue influence might be drawn, noting objectants' burden to establish disparate power and control by Keiko over Rocky and the

ultimate futility in overcoming the "contrary inference" where the evidence is equally consistent with the exercise of free will.

On appeal, objectants contend that factual issues exist as to Rocky's capacity at the time he executed the 2007 will and as to Keiko's undue influence on their father, precluding summary disposition. Objectants further argue that the Surrogate erred in applying the "dual inference" standard in granting Keiko's motion for summary judgment dismissing the objections.

As this Court stated in *Matter of Halpern* (76 AD3d 429, 431 [2010], *affd* 16 NY3d 777 [2011]), "[t]he determination whether to dismiss objections and admit a will to probate is within the discretion of Surrogate's Court, and its determination will not be overturned absent a showing of an abuse thereof." While the burden to establish due execution rests on the proponent (*id.*), as the Surrogate noted, objectants never contended that the will was not duly executed. Further, the attestation clause fulfilled Keiko's initial burden, as proponent, to show that Rocky possessed the requisite capacity to execute the instrument (*see generally Matter of Doody*, 79 AD3d 1380, 1381 [2010]). A supporting affidavit was submitted by the drafting attorney, who was present at the signing, attesting that Rocky appeared to be rational and of sound mind and memory at that time (*see Matter of Korn*, 25 AD3d 379 [2006], *supra*). Upon this prima facie showing of the will's validity, the burden shifted to objectants to submit proof to support their claims that Rocky lacked testamentary capacity and executed the will only as a consequence of the proponent's exertion of undue influence.

■ Objectants' submission of the 1999 presentence report and the 2001 medical letter from Rocky's then-treating physician are not sufficiently contemporaneous to be accorded probative value regarding Rocky's competency in 2007. The evidence indicated that Rocky had cognitive issues as a result of side effects of medication (interferon) that he was taking; but Rocky discontinued using interferon before 2002. Since that time, the record strongly indicates that Rocky was indeed of sound mind and memory, and remained so at the time he signed the will in 2007 (*see Matter of Bryer*, 72 AD3d 532, 532-533 [2010], *lv dismissed* 15 NY3d 815 [2010]).

■ Objectants argue that Rocky's illnesses, which included diabetes and hepatitis C, weakened him, rendering him susceptible to Keiko's strong will and influence. Consequently, they contend that he was coerced to make testamentary dispositions of his property that he would not otherwise have made.

However, the record is devoid of direct evidence of coercion to warrant the conclusion that signing the will was contrary to Rocky's own wishes. While objectants correctly argue that circumstantial evidence is normally sufficient to establish undue influence, such evidence must be "substantial [in] nature" (*Matter of Walther*, 6 NY2d 49, 54 [1959]; *Matter of Ryan*, 34 AD3d 212, 213 [2006], *lv denied* 8 NY3d 804 [2007]).

Objectants maintain that undue influence is suggested by the timing of changes in Rocky's testamentary intentions. Before 2002, all Rocky's property was willed to his marital children, in equal shares. Less than a year after his marriage to Keiko, the 1998 will was amended to bequeath Rocky's estate and 25% of the trust to Keiko outright, with income on the remainder for life.[2] Objectants argue that Keiko's dominance over Rocky may be inferred from her ability to secure consulting contracts for Altesse from BOT, to effect the transfer of BOT offices from Miami to her New York City apartment and to participate in discussions concerning Rocky's testamentary intentions by referring Rocky to her own attorneys.

While "undue influence" is not a term that lends itself to a precise definition, criteria have been devised upon which a determination of undue influence may be predicated:

> " 'It must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear . . . [L]awful influences which arise from the claims of kindred and family or other intimate personal relations are proper subjects for consideration in the disposition of estates, and if allowed to influence a testator in

---

2. Keiko could elect not to receive life income by designating one or more of Rocky's marital children to receive the balance of the corpus.

his last will, cannot be regarded as illegitimate or as furnishing cause for legal condemnation' " (*Walther*, 6 NY2d at 53-54, quoting *Children's Aid Socy. of City of N.Y. v Loveridge*, 70 NY 387, 394-395 [1877]; *see also Ryan*, 34 AD3d at 213-214).

The record portrays Rocky Aoki as a man whose primary preoccupation was the preservation of the business he founded and nurtured, his "baby," the Benihana empire, in all its various manifestations. What also emerges is the image of a man deeply disappointed by the actions of his children, which divided the family and divested it of control over what Rocky clearly regarded as the family business. In response to the divisiveness that Rocky perceived as a threat to Benihana's integrity, he took measures to consolidate control of its operations, and the person he believed could carry out that function was his wife, Keiko, a choice further prompted by the tax advantages afforded by the marital deduction.

While Rocky's ongoing attempts to make peace within the fractious family evince a loving and caring parent, the initial passing of control over his business to his children was motivated not so much by his desire to relinquish his position of authority but by the need to address the immediate consequences of his felony conviction. The family harmony was severely disrupted, however, by Rocky's unannounced marriage to Keiko, whom the children perceived as a threat to their own financial interests in the Benihana enterprise. Ironically, it was their logical reaction to that perceived menace—to prevent Keiko, through Rocky, from obtaining influence and control in the business by diluting his controlling interest in the shares of Benihana, Inc.—that caused Rocky to view their actions as divisive and injurious (by ceding family control over Benihana's operation). Rocky's wish to devise his estate in equal shares to his children and Keiko, as expressed in many of his letters, was overcome by his desire to consolidate management and control over the business entities that comprised the corpus of that estate. Since his faith in the children's capacity to run the enterprise was eroded by what Rocky regarded as their self-interest, the only remaining family member to assume his former role as head of the business was Keiko.

Keiko's increasing involvement with the Benihana enterprise was reflected by the consulting services that her company, Altesse, had provided to BOT since 2003, according to Rocky's deposition testimony in the 2006 action. The children viewed this

involvement as an attempt by Keiko to gain influence and control over the affairs of the family business. Keiko's appointment, in the August 2003 codicil, as trustee with discretionary power to designate which of the children would receive the remaining 75% of the corpus upon Rocky's death, likewise caused much concern among the children. As the Surrogate properly concluded, the terms of the 2007 will are at least as attributable to the confluence of factors arising out of the dissension within the family as to any undue influence by Keiko (*see Walther*, 6 NY2d at 55-56 [record failed to raise a question of fact as to undue influence to permit the question to go to the jury]; *Ryan*, 34 AD3d at 213-214).

■ Objectants' contention that *Walther* is inapposite because it involved a decision after trial is specious. They argue that where the record suggests the opportunity for the exercise of undue influence, a question of fact is presented requiring resolution at trial because a court has no power to resolve factual issues on a summary judgment motion. Objectants term the evidentiary standard enunciated in *Walther* "the dual inference rule," maintaining that the Surrogate improperly resolved the factual issue of undue influence against them by applying the inference that the evidence is equally supportive of the exercise of free will, which otherwise presents a clear question of fact. In contending that *Walther* should be limited to trial motions, they effectively propose that a finding of whether the evidence is insufficient to warrant submission to a jury can only be made in the context of a trial conducted before a jury, a particularly unsatisfactory result from the standpoint of judicial economy.

Objectants confuse an issue of fact and a question of law. Whether the evidence is sufficient to warrant submission to a jury is a question of law, irrespective of whether the issue is raised before or during trial (*Cohen v Hallmark Cards*, 45 NY2d 493, 498-499 [1978], citing *Middleton v Whitridge*, 213 NY 499, 506-508 [1915]). It is perfectly proper for a court to dismiss a proceeding on the ground that the litigant has failed to adduce sufficient evidence to establish a prima facie case, even where such a decision requires extensive factual analysis (*see e.g. Britt v State of New York*, 260 AD2d 6 [1999], *lv denied* 95 NY2d 753 [2000]). Like the claimant in *Britt*, who was subject to an enhanced evidentiary showing of a likelihood of success at trial, objectants are subject to the requirement to adduce substantial evidence of undue influence (*see Matter of Kumstar*, 66 NY2d 691, 693 [1985]), not merely equivocal evidence, as normally

deemed sufficient to withstand a motion for summary judgment dismissing a complaint (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]).

Also unavailing is objectants' argument that summary judgment is precluded because the evidence supports a finding that Keiko had a confidential relationship with Rocky, having recommended her attorneys to him and taken part in discussions concerning the will (*see Matter of Neenan*, 35 AD3d 475, 476 [2006]). Even assuming, for the sake of argument, the existence of such a confidential relationship, it is counterbalanced by the closeness of the marital relationship, evidence of which is unrefuted (*see Matter of Zirinsky*, 43 AD3d 946, 948 [2007], *lv denied* 9 NY3d 815 [2007] [son]). Thus, it is unnecessary to reach the factual question of whether evidence that Rocky sought to protect his legacy, the Benihana empire, by placing his assets in trust with Keiko, an experienced businessperson and confidant, provides an adequate explanation for the bequest (*see Neenan*, 35 AD3d at 476).

The trustees contend that the Surrogate, in the turnover order, erred in denying them reasonable funds to pay the trust's expenses, including settling their accounts as trustees. Having failed to request affirmative relief in the form of monetary reserves from the trust assets to meet their expenses, this argument is unpreserved (*see Lyons v Salamone*, 32 AD3d 757, 759 [2006]). In a June 3, 2009 order, the Surrogate authorized the trustees to pay ordinary expenses pending the outcome of the probate proceeding, at which time the trustees did not request affirmative relief in the form of a reserve of reasonable funds from the trust. The grant of such relief is best left to the discretion of the Surrogate. In any event, as noted by Keiko, the trustees made an application for such relief by way of a cross motion in October 2010, and a decision on that order has been appealed.

It should be noted that the Surrogate, in the order directing the trustees to turn over the trust assets to Keiko as estate fiduciary, correctly held that there could be no distribution of the trust assets until a determination as to the validity of the 2002 releases since the determination may affect the probate of this will.

Accordingly, the decree of the Surrogate's Court, New York County (Kristin Booth Glen, S.), entered on or about September 1, 2010, inter alia, admitting the decedent's will to probate, and bringing up for review an order of the same court and Surrogate, entered on or about August 26, 2010, which granted

petitioner's motion for summary judgment dismissing the objections to probate, should be affirmed, without costs. The order of the same court and Surrogate, entered on or about August 30, 2010, which, inter alia, granted petitioner's motion to direct the trustees of the Benihana Protective Trust to turn over the trust assets to her as estate fiduciary, should be affirmed, without costs.

DeGrasse, Freedman, Richter and Román, JJ., concur.

Decree, Surrogate's Court, New York County, entered on or about September 1, 2010, affirmed, without costs. Order, same court, entered on or about August 30, 2010, affirmed, without costs.